Stephen B. **HIGBIE**

v.

**KOPY–KAT, INC. and John Leslie, Jr.**

Civ. A. No. 74–2432.

United States District Court,
E. D. Pennsylvania.

March 24, 1975.

Cohen, Shapiro, Polisher, Shiekman & Cohen by James R. Redeker, and Alan M. Lerner, Philadelphia, Pa., for plaintiff.

Pechner, Sacks, Dorfman, Rosen & Richardson by Paul R. Rosen, Philadelphia, Pa., for defendants.

## MEMORANDUM

GORBEY, District Judge.

The corporate defendant Kopy-Kat, Inc. has moved for dismissal of Counts I through IV and Count XI of the complaint.

Defendant John J. Leslie, Jr., has moved for an order dismissing the complaint or for summary judgment, based upon an affidavit and supporting documents.

In response thereto plaintiff has filed a memorandum of law in opposition thereto with a two page argument by

plaintiff's counsel, improperly labeled as an affidavit, and an attached exhibit.

Counts I to IV, inclusive, allege violations of § 1 of the Act of Congress of July 2, 1890, c. 647, 26 Stat. 209, as amended, 15 U.S.C. § 1 (Sec. 1 of the Sherman Act). Count XI alleges a violation of the Act of Congress of May 27, 1933, Sec. 5, 48 Stat. 77, Sec. 17, 48 Stat. 84, 15 U.S.C. §§ 77e and 77q (Secs. 5 and 17 of the Securities Act of 1933). Jurisdiction of the court is based upon 28 U.S.C. § 1337, 15 U.S.C. §§ 15 and 26 and 15 U.S.C. § 77b. Counts V to X, inclusive, allege state law causes of action for breach of contract and fraud.

[1–3]   The effect of the plaintiff's allegations in the first four Counts is to charge the corporate defendant and the individual defendant, the present corporate president, with anti-trust violations, including conspiracy. While "it is settled law that if a corporation chooses to conduct part of its business through subsidiary or affiliated corporations, and conspires with them to do something that independent entities cannot conspire to do under § 1 of the Sherman Act, it is no defense that the corporations are, in reality a single economic entity", however "on the other hand, it has been held that a 'corporation cannot conspire with its officers or agents to violate the anti-trust laws' ". Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors Ltd., 416 F.2d 71, at 82 (9th Cir. 1969), cert. den., 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755; Goldlawr, Incorporated v. Shubert, 276 F.2d 614 (3d Cir. 1960); Nelson Radio & Supply Co. v. Motorola, 200 F.2d 911 (5th Cir. 1952), cert. den., 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1952). Accordingly, the allegation charging conspiracy will be stricken from Count IV.

■ However, § 1 of the Sherman Anti-Trust Act is not limited to situations involving a conspiracy. Section 1 of the statute (15 U.S.C.A. § 1) provides:

"Every contract, combination in the form of trust or otherwise, or con-

spiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . ."

Counts I through IV of the complaint are based upon the contention that the Franchise Agreement required the plaintiff to enter into an illegal tie-in arrangement, a per se violation of the statute. Fortner Enter., Inc. v. United States Steel Corp., 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969); Siegel v. Chicken Delight, Inc., 311 F.Supp. 847 (N.D.Cal.1970); Susser v. Carvel Corp., 332 F.2d 505 (2d Cir. 1964).

■   Also, other violations of the Act, not involving conspiracy, are involved in the first four Counts, including price control agreement which is per se illegal. United States v. Sealy, Inc., 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967); United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024 (1944).

■   It is also well established that a corporate officer or director can be held personally liable for damages arising out of an anti-trust violation where he participated in the unlawful acts, or where he has acquiesced or ratified the actions of other officers or agents of the corporation which were in violation of the anti-trust law. Cott Beverage Corporation v. Canada Dry Ginger Ale, 146 F.Supp. 300 (S.D.N.Y.1956); Phelps Dodge Refining Corp. v. Federal Trade Com'n., 139 F.2d 393 (2d Cir. 1943).

The effect of the affidavit of the defendant John Leslie, Jr., is to deny plaintiff's allegations as to his participation in the allegedly illegal acts, and the exhibit attached to the so-called affidavit of plaintiff's counsel indicates, at least indirectly, the contrary.

■   Accordingly, since the moving party for summary judgment has the burden of showing the absence of any genuine issue as to all the material facts, which under applicable principles of substantive law entitle him to a judgment as a matter of law, it appears logical the motion of the defendant John Leslie, Jr.

for summary judgment as to Counts I to IV, inclusive, should be held in abeyance until after discovery. The motion of the corporate defendant to dismiss Counts I through IV, or for summary judgment is denied. See also: Sartor v. Arkansas Natural Gas Corporation, 321 U.S. 620, 627, 64 S.Ct. 724, 728, 88 L.Ed. 967 (1944). "Rule 56 authorizes summary judgment only . . . where it is quite clear what the truth is . . ." Also "A litigant has a right to trial where there is the slightest doubt as to the facts . . ." Doehler Metal Furniture Co. v. United States, 149 F.2d 130, 135 (2d Cir. 1945).

Counts V to X, inclusive, involve state law causes of action for breach of contract and fraud. The motion of the defendant John Leslie, Jr. to dismiss is denied, and his motion for summary judgment will be held in abeyance until after discovery.

With respect to Count XI, pursuant to 15 U.S.C. § 77b, the plaintiff has alleged that the franchise and distributorship contracts executed by the plaintiff and defendant Kopy-Kat, Inc. constitute investment contracts under the Securities Act of 1933. A brief review of the facts is necessary to obtain the proper perspective with respect to this Count. Kopy-Kat, Inc. claims that it is the registered owner of the trademark "Kopy-Kat" and of a related service mark, using the name "Kopy-Kat". The corporation is in the business of franchising copy and printing centers and has approximately 30 such franchises in the United States.

By an instrument dated March 25, 1972, plaintiff and corporate defendant executed a Franchise Agreement, a copy of which is attached to the complaint as Exhibit "A". On or about April 4, 1972, various amendments to the Franchise Agreement were negotiated, a copy being attached to the complaint as Exhibit "B". The franchise fee charged the plaintiff was $3,000, for which defendants agreed to permit plaintiff to trade as an approved Kopy-Kat Center. Plaintiff, as a condition of the licensing agreement, was required to purchase lighting fixtures, interior decor, supplies and furnishings for $27,000. The purchase order form is attached to the complaint as Exhibit "C". Subsequently, as indicated by Exhibit "D" to the complaint, plaintiff agreed to pay and did pay $6,000 to defendant for the purchase of a "deluxe package" of additional equipment. As a further condition of the Franchise Agreement, plaintiff was required to purchase all of his merchandise and supplies from defendants. This requirement was eliminated on or about December 1, 1972, as indicated by Exhibit "E" to the complaint.

By another instrument also dated March 25, 1972, the parties executed a Distributors Agreement, as a part of a single transaction involving the Franchise Agreement referred to in the preceding paragraph, a copy of which is attached to the complaint as Exhibit "F", which was followed by a second Distributors Agreement on or about July 17, 1972, a copy of which is attached to the complaint as Exhibit "G". Pursuant thereto plaintiff posted a $35,000 cash performance bond for which plaintiff was made an authorized representative of Kopy-Kat, Inc., for a portion of the State of Michigan and the entire State of Indiana, as indicated by Exhibit "H" of the complaint.

Exhibit "I" is a copy of the amended agreement made by letter on October 23, 1972.

The documents attached to the complaint indicate the respective obligations of the parties. While there are numerous duties imposed upon the defendant corporation, we are primarily interested in the obligations of the plaintiff as the franchise holder and distributor to see if his obligations are minimal and that profits are to depend mainly upon the efforts of the corporation.

Exhibit "A", in paragraph 4 of the Franchise Agreement, shows very clearly that the duties of the plaintiff were not to be "nominal", or "limited", or "would have little direct effect upon

the receipt of benefits promised by the promoters." It reads: "Company agrees to provide Franchise Holder with such initial training in the methods of efficient operation of a Kopy-Kat Center as is *normally required to assure proficiency*." (Emphasis supplied)

In paragraph 7(g) of the Agreement, plaintiff promises: "To pay directly to Kopy-Kat, Inc., of Pennsylvania a royalty and service fee equal to 5% of all weekly gross sales reduced by applicable sales taxes of Franchise Holder's Kopy-Kat Center; and on or before the 10th day of each month Franchise Holder shall furnish Company with a signed statement of gross sales on such form as Company may from time to time prescribe. While it is understood that statements may be rendered monthly, it is agreed that all remittances of royalty monies shall be made on a weekly basis." From this, it is apparent that no royalty will be due defendant corporation and no profit will be made by the plaintiff unless the efforts of the plaintiff result in sales to the public.

That full-time efforts to the plaintiff were contemplated for the engendering of profits was assured by the restrictive convenant found in paragraph 16 of the Franchise Agreement: "Franchise Holder agrees that during the term of this agreement, and any renewals hereof, and for a further period of three (3) years from and after the termination of this agreement, for any cause whatsoever, that he will not directly or indirectly, on his own account or associated with others, engage in any business of the same nature, or compete with Kopy-Kat Centers anywhere within the continental United States . . ."

Exhibit "B" of the complaint after setting forth the terms given in paragraph 7(g) which require the payment by plaintiff of a 5% commission on sales reads as follows: "The provisions of paragraph 7(g)(1) above shall not apply to the six (6) week period next following the commencement of business operations by the Franchise Holder." This provision was added for the obvious reason that during the six week period after commencement of the business, the efforts of the Franchise Holder may be insufficient to generate enough income to meet the costs attendant upon the establishment of a new enterprise.

Also, in the attached document, "The World of Kopy-Kat Franchising", is the announcement that Kopy-Kat, Inc. will pay up to $50 for membership in any recognized Service, Fraternal or Business Club in the Franchise Holder's community. The reason being, "It is the firm belief of the home office that Kopy-Kat Franchisees should endeavor to participate in as many community service and civic affairs as possible within his marketing area. There is no better way in the opinion of Kopy-Kat management to become a recognized and well respected member of the local business community than to give *some of your spare time* to a worthwhile cause." (Emphasis supplied)

The Distributors Agreement as shown by Exhibit "F" to the complaint also contemplates duties on the part of the Franchise Holder that cannot be said to be "nominal, or limited and would have little direct effect upon receipt of the benefits" promised plaintiff by the defendant corporation.

Kopy-Kat distributors are licensed to assist Kopy-Kat, Inc. of Pennsylvania as part of a national program, to follow up all Kopy-Kat franchise inquiries, to use Distributor's Pilot Center as a showplace for prospective franchisees, to assist franchisees in obtaining locations, training, management and other services. Also to sell "directly or indirectly 10 Kopy-Kat Centers in distributors territory (not including Distributors Center). No time limit on sales is specified, however in lieu of this distributor will post a $10,000 performance bond. Distributor will receive $1,000 from Kopy-Kat, Inc. upon completion and installation of each new Kopy-Kat Center in distributors territory, up until 10 Centers have been sold and bond returned". In return for the efforts of the distributor he is to be paid 10% of the

selling price to the distributor on the sale of all materials, equipment and supplies sold to Kopy-Kat Centers directly by Kopy-Kat, Inc. (after the initial Franchise package) within distributors territory.

Also: Distributor will receive 1½% of all royalties received from Kopy-Kat Centers within his territory". It is perfectly obvious that the agreement contemplates substantial efforts on the part of the Distributor. On April 14, 1972, the agreement was modified to provide for the selling of 25 Kopy-Kat Centers and a performance bond in the amount of $25,000.

Exhibit "G" dated October 23, 1972, is significant: "Re: Your recent telephone call, please be advised that your royalties were to start effective September 15, 1972, and your royalty payments are 60% of your monthly gross, rather than 100%, because you are a Kopy-Kat Distributor. Also you are to receive 5% commission on completion and installation of the equipment package (not the Franchise Fee), on each new Kopy-Kat Center opened directly or indirectly in your territory."

When we turn to the Franchise Agreement of March 25, 1972, we find that: "(3) Company agrees that Franchise Holder, subject to the terms and conditions of this Agreement may trade as an approved Kopy-Kat Center. (4) Company agrees to provide Franchise Holder with such initial training in the methods of effective operation of a Kopy-Kat Center as is normally required to assume proficiency. (5) Company will take various steps to protect the good will of the name 'Kopy-Kat' and Franchise Holder, during the term of this agreement, shall be entitled to trade upon the said good will in accordance with the terms and conditions of this franchise agreement. (6) Company reserves the right to advertise Kopy-Kat Centers in national publication newspapers, and/or radio, and to promote the sales of the service and products through Kopy-Kat Centers in this manner."

While there are other duties on the part of the defendant corporation, no reference will be made to them. Only willful blindness to the contents of the documents and exhibits attached to the complaint, as herein set out, could lead to any other conclusion than that substantially full-time of the franchise holder was to be devoted to the running of a business using the Kopy-Kat name, in order that plaintiff would receive the benefits of the franchise and distributor agreements.

Accordingly, when the principles of law previously given are applied to the facts of this case the conclusion is irresistible that no "investment contract" is involved within the meaning of the Securities Act of 1933, and summary judgment must be granted in favor of both defendants.

This conclusion is also in accord with such recent cases as Wieboldt v. Metz, 355 F.Supp. 255 (S.D.N.Y.1973); Securities and Exch. Com. v. Koscot Inter., Inc., 497 F.2d 473 (5th Cir. 1974); Beefy Trail, Inc. v. Beefy King Intl., Inc., 348 F.Supp. 799 (M.D.Fla.1972); Bitter v. Hoby's International, Inc., 498 F.2d 183 (9th Cir. 1974); Nash & Associates, Inc. v. Lum's of Ohio, Inc., 484 F.2d 392 (6th Cir. 1973).