**BEAUTE CRAFT SUPPLY COM-
PANY, Plaintiff,**

v.

**REVLON, INC., Defendant.**

**Civ. A. No. 75-71511.**

United States District Court,
E. D. Michigan, S. D.

Aug. 11, 1975.

Dykema, Gossett, Spencer, Goodnow & Trigg, Frank K. Zinn, Robert V. Seymour, Detroit, Mich., for plaintiff.

George E. Brand, Jr., Detroit, Mich., (Local Counsel), Jay L. Himes, New York City, for defendant.

## OPINION AND ORDER GRANTING PRELIMINARY INJUNCTIVE RELIEF

KAESS, Chief Judge.

This matter comes before the Court on the motion of the plaintiff, Beaute Craft Supply Company (Beaute Craft), for an injunction *pendente lite,* enjoining the defendant, Revlon, Inc. (Revlon), from refusing to do business with the plaintiff pending the outcome of this litigation. The underlying action sounds in antitrust, based on the alleged illegal and wrongful termination of the plaintiff's franchise agreement with the defendant. The complaint alleges violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14.

A brief review of the circumstances and background facts is necessary to a proper determination of the issue before the Court. Beaute Craft is a Michigan corporation which has been located in Detroit, Michigan, since 1940. Beaute Craft engages in the sale of cosmetics, beauty products, and beauty parlor supplies and equipment to beauty salons, schools, and colleges. It currently employs twenty-five salesmen who service approximately three thousand accounts in the Detroit, Toledo, Grand Rapids, Kalamazoo, and Flint areas. Roughly fourteen of these salesmen operate in the Detroit area. It has, for several years, marketed the products of major cosmetic manufacturers, i. e. Clairol, Wella, Breck, L'Oreal, Rilling, Zotos, and, of course, Revlon. Its total annual revenues, on the sale of all products, is in excess of Four Million Dollars.

Approximately thirty years ago, Beaute Craft became a franchised dealer of Revlon, Inc. Revlon is one of the largest enterprises in the cosmetics industry with total annual sales of Six Hundred Six Million Dollars. The sales of cosmetic products are made both directly to retailers and through beauty distributors, such as Beaute Craft, who sell primarily to the professional market. The product lines sold include lipsticks, nail enamel, manicure items, facial make-up, and skin and hair products. With respect to its beauty distributors, Revlon is relatively selective, dealing with approximately one hundred eighty of about two thousand such distributors. Of these one hundred eighty distributors, the sales of Beaute Craft rank it near the top.

As indicated previously, Beaute Craft handles several lines of products which are in direct competition with the Revlon items it distributes. In 1972, Beaute Craft began to distribute the products of a new company, Redken Laboratories, Inc., in its Toledo market. The Redken line, which consists of hair products, facial treatment creams, and liquid make-up, is competitive with products sold by Revlon, or its wholly-owned subsidiary, Revlon-Realistic Professional Products, Inc. Through discussions between Revlon and Beaute Craft, it became apparent that Revlon was concerned with the addition of this new line of competing products to those already handled by Beaute Craft. As a result, Beaute Craft promised, either voluntarily or upon request, to limit its sale of Redken products to the Toledo market and not to introduce them to the Detroit area. The relationship between the parties remained in this status until May, 1975, when Beaute Craft entered into an agreement with Redken to distribute their products in the Detroit market.

Upon being advised of this development by Beaute Craft, Mr. Bottner of the Revlon-Realistic Professional Products Division of Revlon indicated that the Beaute Craft franchise would be terminated immediately. This decision was apparently not final as subsequent discussion reveals that the franchise would not be terminated if Beaute Craft would

rescind its agreement and not introduce Redken to the Detroit area. Beaute Craft did not retreat, and the franchise was eventually ended and granted to other distributors in the area.

The facts thus far are not seriously in dispute. Serious questions arise, however, over the reasons behind the termination of the Beaute Craft distributorship. Revlon contends that Beaute Craft was terminated because they were becoming "overlined." That is, in the opinion of Revlon, Beaute Craft was taking on too many different lines of products to the extent that their sales efforts toward Revlon products would be hampered and reduced. Beaute Craft, on the other hand, contends that threats of termination, and the eventual termination, were directed toward the exclusion of competitive products from the Detroit market and in restraint of trade. Further, the plaintiff contends that the cancellation of its franchise by the defendant was an exercise of its monopoly power in the sale of professional nail enamel and lipsticks to the beauty trade. The defendant admittedly does have a large share of this particular market.

■ There can be little doubt that a manufacturer of goods can be free to trade to whomever he choses. This right, however, is not without restrictions. As the Court noted in *United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1918), a bench mark case in antitrust law:

> "The purpose of the Sherman Act is to prohibit monopolies, contracts, and combinations which probably would unduly interfere with the free exercise of their rights by those engaged, or who wish to engage, in trade and commerce—in a word to preserve the right of freedom to trade. In the absence of any purpose to create or maintain a monopoly, the act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion

as to parties with whom he will deal. And, of course, he may announce in advance the circumstances under which he will refuse to sell. 'The trader or manufacturer, on the other hand, carries on an entirely private business, and can sell to whom he pleases.' *United States v. Trans-Missouri Freight Association*, 166 U.S. 290, 320 [17 S.Ct. 540, 41 L.Ed. 1007]. 'A retail dealer has the unquestioned right to stop dealing with a wholesaler for reasons sufficient to himself, and may do so because he thinks such dealer is acting unfairly in trying to undermine his trade.' *Eastern States Retail Lumber Dealers' Association v. United States*, 234 U.S. 600, 614, [34 S.Ct. 951, 955, 58 L.Ed. 1490]." (Citations omitted.)

See also: *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 376, 87 S. Ct. 1856, 18 L.Ed.2d 1249 (1966); *United States v. Parke, Davis & Co.*, 362 U.S. 29, 46, 80 S.Ct. 503, 4 L.Ed.2d 505 (1959); *United States v. Bausch & Lomb Optical Co.*, 321 U.S. 707, 722, 64 S.Ct. 805, 88 L.Ed. 1024 (1943); *Federal Trade Commission v. Beech-Nut Packing Co.*, 257 U.S. 441, 454, 42 S.Ct. 150, 66 L.Ed. 307 (1921). Thus, the termination of an exclusive distributorship, absent other considerations, is not, in and of itself, violative of the antitrust statutes. As the Court indicated in *Ace Beer Distributors, Inc. v. Kohn, Inc.*, 318 F.2d 283 (6th Cir. 1963), where the Stroh Brewery Company had simply terminated one distributorship in favor of another:

> "Unless it can be said that the refusal to deal with plaintiff had the result of suppressing competition and thus constituted 'restraint of trade' within the meaning of Section 1 of the Sherman Act, there is no violation of the Act. We do not think that the substitution by Stroh Brewery Company of one distributor for another had this result." *Ace, supra,* at 287.

Where, however, the refusal to deal, or the termination of the sales relationship

operates "in restraint of trade," or is an "attempt to monopolize" or which "may be to substantially lessen competition or tend to create a monopoly in any line of commerce," such action is not permitted. 15 U.S.C. §§ 1, 2, 14. And it has been held that:

".  .  . defendants who are or may be guilty of anti-competitive practices should not be permitted to terminate franchises, leases or sales contracts when such terminations would effectuate those practices." (Citations omitted.) *Milsen Company v. Southland Corp.*, 454 F.2d 363, 366 (7th Cir. 1972).

In *United States v. Arnold, Schwinn & Co., supra,* the Court addressed itself to practices which, although proper in a business sense, fall within the proscriptions of the statutes:

"Schwinn sought a better way of distributing its product: a method which would promote sales, increase stability of its distributor and dealer outlets, and augment profits. But this argument, appealing as it is, is not enough to avoid the Sherman Act proscription; because, in a sense, every restrictive practice is designed to augment the profit and competitive position of its participants. Price fixing does so, for example, and so may a well-calculated division of territories. See *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, [60 S.Ct. 811, 84 L.Ed. 1129] (1940). The antitrust outcome does not turn merely on the presence of sound business reason or motive. Here, for example, if the test of reasonableness were merely whether Schwinn's restrictive distribution program and practices were adopted 'for good business reasons' and not merely to injure competitors, or if the answer turned upon whether it was indeed 'good business practice,' we should not quarrel with Schwinn's eloquent submission or the finding of the trial court. But our inquiry cannot stop at that point. Our inquiry is whether, assuming nonpredatory motives and business purposes and the incentive of profit and volume considerations, the effect upon competition in the market place is substantially adverse. The promotion of self-interest alone does not invoke the rule of reason to immunize otherwise illegal conduct. *It is only if the conduct is not unlawful in its impact in the market place or if the self-interest coincides with the statutory concern with the preservation and promotion of competition that protection is achieved. Chicago Board of Trade [v. United States] [supra]*, 246 U.S. 231 at 238 [38 S.Ct. 242, at 243, 62 L.Ed. 683]." *Arnold, Schwinn & Co., supra*, 388 U.S. at 374–375, 87 S.Ct. at 1863. (Emphasis added.)

It is within the general context of this framework that the Court must examine the current situation.

Needless to say, certain guidelines have also been set forth with respect to determining the propriety of preliminary injunctive relief. These standards require the moving party to establish:

(1) The probability of success on the merits; and,

(2) The possibility of irreparable harm.

*Brown v. Chote*, 411 U.S. 452, 456, 93 S. Ct. 1732, 36 L.Ed.2d 420 (1972); *Corning Glass Works v. Lady Cornella, Inc.*, 305 F.Supp. 1229, 1230 (E.D.Mich. 1969); 15 U.S.C. § 26. The first of these standards seems to have been somewhat relaxed, at least insofar as antitrust cases are concerned. In *Brandeis Machinery & Supply Corp. v. Barber-Greene Co.*, 503 F.2d 503 (6th Cir. 1974), the Court was confronted with a review of a grant of preliminary injunctive relief by the District Court. The facts before the Court were vaguely similar to those before this Court. In *Brandeis*, the plaintiff had been an exclusive distributor of the products of the defendant. Conflict arose when the de-

fendant refused to continue to sell its dominant line of products to the plaintiff, unless the plaintiff also agreed to exclusively distribute a less popular line of equipment. Brandeis decided to take on a distributorship of Rexnord products which was in competition with the defendant's less popular line. The defendant then terminated its entire dealer agreement with the plaintiff. In addressing the issue of success on the merits, the Court noted:

> "In determining whether sufficient likelihood of success exists as one of the necessary conditions to preliminary injunctive relief, the trial court was required to 'satisfy itself, not that the plaintiff certainly has a right, but that he has a fair question to raise as to the existence of such a right.' *American Federation of Musicians v. Stein,* 213 F.2d 679, 683 (6th Cir. 1954), cert. denied, 348 U.S. 873, 75 S.Ct. 108, 99 L.Ed. 687 (1954). Similarly in an antitrust action, Judge Jerome Frank held that:
>
>> '[I]t will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful, as to make them a fair ground for litigation and thus for mere deliberate investigation.' *Hamilton Watch Co. v. Benrus Watch Co.,* 206 F.2d 738, 740 (2nd Cir. 1953)." *Brandeis, surpa,* at 505.

See also: *Milsen, supra,* at 366, n.3; *Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197, 1205–1206 (2nd Cir. 1970). While this case does not involve a "tying arrangement," such as was found in *Brandeis,* there has been an agreement or promise, the effect of which is at least colorably an attempt to exclude competitive products from the market place. As indicated previously, there is a great deal of conflict as to whether that was the purpose of the arrangement. If such an attempt was made, then the antitrust laws may well have been violated. The Court is satisfied at this point, after a careful review of the affidavits and depositions submitted, that the plaintiff "has a fair question to raise."

Similarly, the Court is satisfied that the plaintiff will suffer possibly irreparable harm should this injunction not issue. The sales of Revlon products constitute approximately twenty to twenty-five percent of the plaintiff's total sales volume. The immediate loss of such sales volume would necessarily have a devastating effect on the continuing business of Beaute Craft. On the other side of the coin, the Court is not cognizant of any adverse effect such an injunction would have on the defendant. There has been no indication that the former relationship between the parties has been anything less than amicable or that the plaintiff has ever been a credit risk to the defendant.

Under these circumstances, it is apparent that the balance of hardships attendant to a refusal to do business tips in favor of the plaintiff. *Semmes, supra,* at 1205; *Omega Importing Corp. v. Petri-Kine Camera Company,* 451 F.2d 1190, 1194 (2nd Cir. 1971); *Dopp v. Franklin National Bank,* 461 F.2d 873, 881 (2nd Cir. 1972); *Mullis v. Arco Petroleum Corp.,* 502 F.2d 290, 293 (7th Cir. 1974).

For the reasons set forth above, the motion of the plaintiff for a preliminary injunction enjoining the defendant from refusing to do business with the plaintiff be, and hereby is, granted. The plaintiff will submit an appropriate Order to the Court.