CARLO C. GELARDI CORP., a New
Jersey Corporation, Plaintiff,

v.

MILLER BREWING COMPANY, a Wisconsin Corporation, et al., Defendants.

Civ. A. No. 76–824.

United States District Court,
D. New Jersey.

Oct. 1, 1976.

See also, D.C., 421 F.Supp. 233.

James R. Heaney, Madison, N. J., for plaintiff.

John E. Keale, Carpenter, Bennett & Morrissey, Newark, N. J., Edward F. Butler, Conboy, Hewitt, O'Brien & Boardman, New York City, for defendants.

## OPINION

BARLOW, District Judge.

In a telegram dated May 4th, 1976, the defendant Miller Brewing Company attempted to sever its contractual relationship with the plaintiff, Carlo C. Gelardi Corp. The plaintiff commenced this action on May 5th, 1976, alleging violations of certain provisions of the antitrust laws of the United States by Miller, three employees of Miller, and an unspecified number of unidentified co-conspirators. The complaint also alleged that Miller breached a distributorship agreement with the plaintiff. On May 7th, the plaintiff filed an amended complaint alleging violations of the New Jersey Franchise Practices Act, N.J.Stat.Ann. § 56:10–1, *et seq.* On that same day, this Court signed an order to show cause and entered an order temporarily restraining Miller from discontinuing the sale of beer products to the plaintiff.

In an opinion dated May 27th, 1976, this Court concluded that the plaintiff had demonstrated a reasonable probability of eventual success on the merits with respect to the question of the applicability of the Franchise Practices Act. As a result, the Court issued a preliminary injunction on May 28th, 1976, directing Miller to comply with the notice provisions of the Act, *id.* § 56:10–5 (hereinafter "Section 5"). This decision required Miller to wait at least sixty (60) days from May 4th, 1976, before effectuating its intention to terminate the plaintiff's franchise. On June 1st, 1976, the plaintiff filed the instant motion for a preliminary injunction, seeking to prevent Miller from terminating the franchise arrangement upon the expiration of these sixty (60) days.

The narrow question presented in the earlier motion for a preliminary injunction was whether the Franchise Practices Act applied, so as to require sixty (60) days' notice prior to the termination of the plaintiff's franchise. The opinion issued in response to that motion is now the law of the case, and is hereby incorporated into this opinion. The current motion, however, involves a more difficult question—whether Miller, having already given the sixty (60) days' notice, is legally entitled to terminate the plaintiff's franchise. The plaintiff asserts that Miller is not entitled to terminate the franchise, and advances six legal theories in support of this contention. The Court must now consider whether the plaintiff has demonstrated a reasonable probability of eventual success on the merits with respect to any of these theories. *See Oburn v. Shapp,* 521 F.2d 142, 147 (3d Cir. 1975); *Delaware River Port Authority v. Transamerican Trailer Transp., Inc.,* 501 F.2d 917, 919–20 (3d Cir. 1974); *Winkleman v. New York Stock Exch.,* 445 F.2d 786, 789 (3d Cir. 1971).

■ The following arguments have been advanced by the plaintiff in support of its motion:

(1) Miller's allocation of beer products is an unreasonable restraint of trade, in violation of the Sherman Act, 15 U.S.C. § 1;

(2) Miller's establishment of a dual distributorship[1] in the plaintiff's area of primary responsibility[2] manifests

---

1. The plaintiff's area of primary responsibility—*see* n.2 *infra*—was Somerset and Middlesex counties. In July, 1975, the area of primary responsibility of Warren Distributing Co., which had been operating in Warren and Hunterdon counties, was extended to include Somerset and Middlesex counties. Thus, both the plaintiff and Warren were responsible for distributing Miller products in Somerset and Middlesex counties. This situation—two distributors being responsible for the same geographical area—will be referred to as a "dual distributorship".

2. According to Miller's standard contract for distributors, the "area of primary responsibility" is a geographical area "within which Distributor's performance is to be determined under the standards set forth in the Agreement". The area of primary responsibility "is not for the purpose of limiting Distributor's sales" to a particular location, nor is it "to be regarded as being exclusively Distributor's territory unless otherwise required by applicable law or regulation". *See* Distributorship Agreement, Schedule II. *See also* Note, Restricted Channels of Distribution Under the Sherman Act, 75 Harv. L.Rev. 795, 797 (1962).

a conspiracy to force the plaintiff out of business, in violation of the Sherman Act, *id.* §§ 1, 2;

(3) Miller's entire course of conduct toward the plaintiff manifests a conspiracy to force the plaintiff out of business, in violation of the Sherman Act, *id.*;

(4) Miller's terms of sale to the plaintiff constitute price discrimination, in violation of the Clayton Act as amended by the Robinson-Patman Act, *id.* § 13(a);

(5) Miller is attempting to terminate the plaintiff's franchise without good cause, in violation of § 5 of the New Jersey Franchise Practices Act; and

(6) Miller has imposed unreasonable standards of performance upon the plaintiff, in violation of § 7(e) of the Franchise Practices Act, N.J.Stat. Ann. § 56:10–7(e).[3]

■ The plaintiff's first contention must fail on the present record. "Essential to the violation of the antitrust laws is an agreement or combination, the purpose and effect of which is restraint of trade and suppression of competition." *See Viking Theatre Corp. v. Paramount Film Distrib. Corp.,* 320 F.2d 285, 293 (3d Cir. 1963), *aff'd,* 378 U.S. 123, 84 S.Ct. 1657, 12 L.Ed.2d 743 (1964); *Martin B. Glauser Dodge Co. v. Chrysler Corp.,* 418 F.Supp. 1009, at 1015 (D.N.J.1976); *Kaiser v. General Motors Corp. (Pontiac Motor Div.),* 396 F.Supp. 33, 38 (E.D.Pa.1975). Whatever the merits of plaintiff's argument that the Miller allocation system[4] is an unreasonable restraint of trade,[5] there is no evidence to indicate that the allocation system is the result of a contract, combination, or conspiracy, as re-

**3.** Miller has argued that this Court lacks jurisdiction over the claims based on state law because the plaintiff has failed to plead or prove complete diversity of citizenship. *See Strawbridge v. Curtiss,* 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806); 28 U.S.C. § 1332. In particular, Miller points out that both the plaintiff and the defendant William D. Mickey were citizens of New Jersey at the time this suit was commenced. Nevertheless, this Court will continue to exercise jurisdiction over the state law aspects of this case under the doctrine of pendent jurisdiction, because it is clear that the plaintiff's federal and state claims derive from a "common nucleus of operative fact" and that trying all these claims in one judicial proceeding will promote convenience and sound judicial administration. *See Aldinger v. Howard,* —— U.S. ——, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976); *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Tully v. Mott Supermarkets, Inc.,* 540 F.2d 187, 195–197 (3d Cir. 1976). It is not necessary that pendent jurisdiction be affirmatively pleaded. *See* Fed.R.Civ.P. 8(a)(1); 5 C. Wright & A. Miller, Federal Practice and Procedure § 1207 (1969). Even if pendent jurisdiction were lacking, the defendant Mickey could be dropped as a party in order to preserve diversity jurisdiction, if his presence is not required under Fed.R.Civ.P. 19. *See* Fed.R.Civ.P. 21; 7 C. Wright & A. Miller, *supra,* § 1685 (1972).

**4.** During the peak months of beer sales, spring and summer, there is a shortage of beer among the distributors, because Miller apparently cannot produce sufficient beer to meet demand. Beginning in 1975, Miller found it necessary, during these periods of short supply, to allocate its products according to a formula which determines the present year's allocation based upon a particular distributor's contribution to sales in a given region during the prior year. For example, the plaintiff's sales constituted 2.3 per cent (2.3%) of the Eastern Region's sales volume in 1975. During periods of short supply in 1976, the Miller formula would allocate to the plaintiff 2.3 per cent (2.3%) of the beer available to the Eastern Region.

**5.** *See generally Bale v. Glasgow Tobacco Bd. of Trade, Inc.,* 339 F.2d 281 (6th Cir. 1964); *Rogers v. Douglas Tobacco Bd. of Trade, Inc.,* 266 F.2d 636, 643–44 (5th Cir.), *cert. denied,* 361 U.S. 833, 80 S.Ct. 85, 4 L.Ed.2d 75 (1959); *Rogers v. Douglas Tobacco Bd. of Trade, Inc.,* 244 F.2d 471 (5th Cir. 1957); *Thomas v. Amerada Hess Corp.,* 393 F.Supp. 58, 74 (M.D.Pa. 1975); *Quigley v. Exxon Co.,* 376 F.Supp. 342, 350–53 (M.D.Pa.1974); *Harlem River Consumers Cooperative, Inc. v. Associated Grocers of Harlem, Inc.,* 371 F.Supp. 701, 709 (S.D.N.Y.), *aff'd,* 493 F.2d 1352 (2d Cir. 1974); *United Banana Co. v. United Fruit Co.,* 245 F.Supp. 161, 171–72 (D.Conn.1965), *aff'd,* 362 F.2d 849 (2d Cir. 1966); *Independent Iron Works, Inc. v. United States Steel Corp.,* 177 F.Supp. 743, 748 (N.D.Cal.1959), *aff'd,* 322 F.2d 656 (9th Cir.), *cert. denied,* 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 165 (1963); *Banana Distribs., Inc. v. United Fruit Co.,* 162 F.Supp. 32, 42 (S.D.N.Y. 1958), *rev'd on other grounds,* 269 F.2d 790 (2d Cir. 1959).

quired by § 1 of the Sherman Act.[6] Indeed, the plaintiff's own briefs suggest that Miller alone is responsible for the creation and implementation of the allocation system:

> There is no binding contractual requirement that Miller allocate beer in this manner. This has been a procedure adopted in Miller's sole discretion. Miller can determine to provide beer to a distributor even though he had no record in the prior year . . . . Further, Miller, *in its sole discretion,* can determine to deliver beer to some distributors in amounts which vary from a strict application of the 'allocation' formula.

Brief for the Plaintiff at 12.

The plaintiff has not cited, nor has this Court been able to find, anything in the present record to suggest that any of Miller's distributors have participated in or influenced the creation or implementation of the allocation system. The only participants revealed by the record are the various Miller employees necessary to implement the allocation program. However, there must be a plurality of actors to contract, combine, or conspire to restrain trade in violation of § 1 of the Sherman Act, and it is well-settled that the required plurality is not supplied by a combination of a corporation and its employees. *See Goldlawr, Inc. v. Shubert,* 276 F.2d 614, 617 (3d Cir. 1960). *See also Morton Bldgs. of Neb., Inc. v. Morton Bldgs., Inc.,* 531 F.2d 910, 917 (8th Cir. 1976); *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.,* 416 F.2d 71, 82–84 (9th Cir. 1969), *cert. denied,* 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970); *Higbie v. Kopy-Kat, Inc.,* 391 F.Supp. 808, 810 (E.D.Pa.1975); *Quigley v. Exxon Co.,* 376 F.Supp. 342, 350 (M.D.Pa. 1974); *Goldinger v. Boron Oil Co.,* 375

F.Supp. 400, 406 (W.D.Pa.1974), *aff'd,* 511 F.2d 1393 (3d Cir. 1975).

The plaintiff's second and third contentions allege that the defendants and others conspired to eliminate the plaintiff as a beer distributor in interstate commerce, and that the following steps were taken to consummate said conspiracy:[7]

(a) Miller established a dual distributorship in the plaintiff's area of primary responsibility;

(b) Miller refused to extend to the plaintiff the normal credit extended to other distributors in New Jersey, either for regular shipments of beer or to build up inventory prior to the peak season;

(c) Miller required the plaintiff to pay for beer in advance of delivery;

(d) Miller imposed an arbitrary order and payment schedule on the plaintiff and required strict adherence to the schedule;

(e) Miller rerouted the shipments of beer to the plaintiff, causing delays in receipt; and

(f) Miller interfered with the plaintiff's merger negotiations with Warren Distributing Co.

The plaintiff asserts that this conspiracy is in violation of §§ 1 and 2 of the Sherman Act.

▇▇ Assuming, *arguendo,* that the alleged conspiracy existed, it does not appear that the plaintiff will be able to show that its object was one rendered illegal by § 1.[8] The fact that Miller's actions had an adverse impact upon the plaintiff's business does not, by itself, amount to a violation of the Sherman Act. Damage alone does not constitute liability under the Act. *See Ace Beer Distribs., Inc. v. Kohn, Inc.,* 318 F.2d

---

6. 15 U.S.C. § 1 provides in relevant part:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

7. This list does not purport to be all-inclusive.

8. Some of the defendants' actions may amount to business torts under New Jersey law, but the plaintiff has not pursued any state law tort remedies. It should be observed that tortious conduct directed against one engaged in interstate commerce or which has an effect on interstate commerce does not automatically constitute a violation of the Sherman Act. *See Ace Beer Distribs., Inc. v. Kohn, Inc.,* 318 F.2d 283, 286 (6th Cir.), *cert. denied,* 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963).

283, 287 (6th Cir.), *cert. denied,* 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963). A conspiracy which results merely in the substitution of one distributor for another does not violate § 1. *See Craig v. Sun Oil Co.,* 515 F.2d 221, 223 (10th Cir. 1975). *See also Bowen v. New York News, Inc.,* 522 F.2d 1242, 1254 (2d Cir. 1975), *cert. denied,* 425 U.S. 936, 96 S.Ct. 1667, 48 L.Ed.2d 177 (1976); *Ark Dental Supply Co. v. Cavitron Corp.,* 461 F.2d 1093, 1094 (3d Cir. 1972); *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., supra,* 416 F.2d at 78; *V. & L. Cicione, Inc. v. C. Schmidt & Sons, Inc.,* 403 F.Supp. 643, 648–49 (E.D.Pa. 1975). Nor is an increase in the number of distributors actionable under § 1. *See Craig v. Sun Oil Co., supra,* 515 F.2d at 223. The elimination of the plaintiff's distributorship would violate § 1 only if, in fact, it constituted a restraint of trade or was motivated by an anti-competitive intent. *See V. & L. Cicione, Inc. v. C. Schmidt & Sons, Inc., supra,* 403 F.Supp. at 649. *See also Continental Distrib. Co. v. Somerset Importers, Ltd.,* 411 F.Supp. 754, 756 (N.D.Ill. 1976); *Beaute Craft Supply Co. v. Revlon, Inc.,* 402 F.Supp. 385, 387–88 (E.D.Mich. 1975); *cf. Fray Chevrolet Sales, Inc. v. General Motors Corp.,* 536 F.2d 683, 686 (6th Cir. 1976); *Morton Bldgs. of Neb., Inc. v. Morton Bldgs., Inc., supra,* 531 F.2d at 917; *Dreibus v. Wilson,* 529 F.2d 170, 172 (9th Cir. 1975); *Westinghouse Elec. Corp. v. CX Processing Labs., Inc.,* 523 F.2d 668, 673 (9th Cir. 1975).

In this case, even if there had been an agreement between Miller and Warren to eliminate the plaintiff's distributorship and to replace it with the Warren distributorship, the plaintiff could not prevail on its § 1 claim absent proof of an anti-competitive purpose or a resulting restraint of trade. This Court is not convinced that that proof will be forthcoming.

 Before there can be a conclusion as to whether there has been a restraint of trade, a determination must be made as to what is the relevant market within which to gauge a firm's power or the effects of its activities. *See Coniglio v. Highwood Servs.,*

*Inc.,* 495 F.2d 1286, 1292 (2d Cir.), *cert. denied,* 419 U.S. 1022, 95 S.Ct. 498, 42 L.Ed.2d 296 (1974); *American Aloe Corp. v. Aloe Creme Labs., Inc.,* 420 F.2d 1248, 1256 (7th Cir.), *cert. denied,* 398 U.S. 929, 90 S.Ct. 1820, 26 L.Ed.2d 91; 400 U.S. 820, 91 S.Ct. 37, 27 L.Ed.2d 47 (1970). The relevant market is comprised of a geographic and a product market. *See Morton Bldgs. of Neb., Inc. v. Morton Bldgs., Inc., supra,* 531 F.2d at 918. The geographic market encompasses the area in which the defendant effectively competes with other individuals or businesses for the distribution of the relevant product. *Id.* The relevant product market is composed of products that have reasonable interchangeability for the purposes for which they are produced— price, use and qualities considered. *See United States v. E. I. du Pont de Nemours & Co.,* 351 U.S. 377, 395, 404, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); *Yoder Bros., Inc. v. California-Florida Plant Corp.,* 537 F.2d 1347, 1366–67 (5th Cir. 1976); *Coleman Motor Co. v. Chrysler Corp.,* 525 F.2d 1338, 1349 (3d Cir. 1975).

> While the relevant market for purposes of section 2 is not necessarily that for purposes of section 1, there still must be some consideration of the effect of a defendant's conduct on some significant part of the market.

*George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.,* 508 F.2d 547, 562 (1st Cir. 1974), *cert. denied,* 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975) (emphasis added).

 The current record fails to present adequate probative evidence bearing upon the relevant product market. Certainly we are not prepared to say that Miller beer products are so unique that they constitute a product market in themselves. The plaintiff has not sufficiently identified what types of beer are reasonably interchangeable substitutes for Miller beer products within the appropriate area of competition. There is an absence of market data, figures, or other relevant material adequately describing the nature, cost, usage, or other comparative features of competing prod-

ucts. In the absence of such proof, courts are incapable of determining the extent of cross-elasticity of demand in the market.

Even if the relevant market had been adequately defined, there is no evidence that the beer of other breweries was any less available in Middlesex and Somerset counties as a result of the actions of Miller and Warren. There is no evidence whatever of harm to general competition in the market. There is nothing to indicate that the number of competitors has been affected, or that the market has been fixed or manipulated, so that competition is lessened.

In conclusion, the plaintiff has failed to establish a *prima facie* case of either a per se violation of § 1 or a violation of the "rule of reason".[9] Accordingly, no preliminary injunction can be based on the § 1 aspects of plaintiff's second and third contentions.

Turning to the charges under § 2 of the Sherman Act, it should first be noted that that section specifies three separate offenses: monopolization, attempt to monopolize, and conspiracy to monopolize.[10] *See Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 709, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); *Mt. Lebanon Motors, Inc. v. Chrysler Corp.*, 283 F.Supp. 453, 460 (W.D.Pa.1968), aff'd, 417 F.2d 622 (3d Cir. 1969). The plaintiff's second and third contentions apparently rely on the latter two offenses.

The essential elements of an "attempt to monopolize" are that the actor have (1) a specific intent to monopolize the relevant market and (2) sufficient market power to come dangerously close to success.

*See Swift & Co. v. United States*, 196 U.S. 375, 396, 25 S.Ct. 276, 49 L.Ed. 518 (1905); *Yoder Bros., Inc. v. California-Florida Plant Corp.*, supra, 537 F.2d at 1368; *Coleman Motor Co. v. Chrysler Corp.*, supra, 525 F.2d at 1348; *Cliff Food Stores, Inc. v. Kroger, Inc.*, 417 F.2d 203, 207 (5th Cir. 1969). It is obvious that definition of the relevant market is critical to the proof of these two elements, and thus of a § 2 violation. *See Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965); *Coleman Motor Co. v. Chrysler Corp.*, supra 525 F.2d at 1348.

As we pointed out in our discussion of the plaintiff's § 1 claims, the plaintiff has failed to submit any evidence from which this Court could determine the relevant product market. Given this Court's own knowledge of the state of the national beer market, it does not seem likely that the plaintiff will be able to establish that the relevant product market consists of Miller products alone.[11] If the relevant market is all beer in Middlesex and Somerset counties, Miller could not monopolize that market by driving the plaintiff out of business—competition from the beer of other breweries would severely limit Miller's ability to determine prices. Since there is nothing in the record to indicate that Miller's conduct, even if it resulted in eliminating intra-brand competition, could achieve a monopoly, Miller cannot be held liable for having attempted to monopolize.

The essential element of a "conspiracy to monopolize" is a specific intent to monopolize a designated segment of commerce.[12] *See Bowen v. New York News,*

9. *See Standard Oil Co. v. United States*, 221 U.S. 1, 60, 31 S.Ct. 502, 55 L.Ed. 619 (1911).

10. 15 U.S.C. § 2 provides in relevant part:
 Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony
 . . . .

11. It may be observed that every manufacturer has a natural monopoly over its own products,

especially when the products are sold under trademark. However, there is no violation of the antitrust laws unless the manufacturer uses his natural monopoly to gain control of the relevant market in which his products compete. *See Trixler Brokerage Co. v. Ralston Purina Co.*, 505 F.2d 1045, 1051 (9th Cir. 1974).

12. Of course, the plaintiff must first prove the existence of a conspiracy. We will assume, for the sake of the discussion in the text, that a conspiracy has been proved.

*Inc., supra,* 522 F.2d at 1258; *Salco Corp. v. General Motors Corp., Buick Motor Div.,* 517 F.2d 567, 576 (10 Cir. 1975); *Hudson Valley Asbestos Corp. v. Tougher Heating & Plumbing Co.,* 510 F.2d 1140, 1144 (2d Cir.), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2416, 44 L.Ed.2d 679 (1975); *Harlem River Consumers Cooperative, Inc. v. Associated Grocers of Harlem, Inc.,* 408 F.Supp. 1251, 1285 (S.D.N.Y.1976). Although specific intent to monopolize, and not monopoly power,[13] is the essential element, the absence of any likelihood of success is certainly some evidence on the question of whether such specific intent existed. *See Hudson Valley Asbestos Corp. v. Tougher Heating & Plumbing Co., supra,* 510 F.2d at 1144. Here, once again, there is nothing whatsoever in the record to indicate that Miller is in dangerous probability of achieving monopoly power in Middlesex and Somerset counties.[14] Indeed, it seems much more likely that Miller will be able to demonstrate the futility of any effort to monopolize that beer market. Thus, this Court is not convinced that the plaintiff will be able to prove the existence of the specific intent necessary for a § 2 conspiracy to monopolize violation.[15]

The plaintiff's fourth contention is that Miller's terms of sale to the plaintiff constitute price discrimination, in violation of § 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a).[16] Specifically, the plaintiff complains that it was required to pay cash in advance or cash on receipt, while Miller extended credit to other distributors in the Eastern Region who requested it.

The first difficulty with this argument is that most of the evidence relating to Miller's terms of sale to other distributors in the Eastern Region is irrelevant. An essential element in a price discrimination case is that there exists competition between the disfavored customer and the favored customer(s). *See FTC v. Borden Co.,* 383 U.S. 637, 643, 86 S.Ct. 1092, 16 L.Ed.2d 153 (1966); *M. C. Mfg. Co. v. Texas Foundries, Inc.,* 517 F.2d 1059, 1066 (5th Cir.

13. Monopoly power is the power to fix prices or exclude competitors. *See United States v. E. I. du Pont de Nemours & Co.,* 351 U.S. 377, 389, 76 S.Ct. 994, 100 L.Ed. 1264.

14. Although the plaintiff is not strictly required to prove what is the relevant market, it must still show that "some appreciable part of interstate commerce" is the subject of the conspiracy. *See United States v. Yellow Cab Co.,* 332 U.S. 218, 225–26, 67 S.Ct. 1560, 1564, 91 L.Ed. 2010 (1947); *Salco Corp. v. General Motors Corp., Buick Motor Div.,* 517 F.2d 567, 576 (10th Cir. 1975). We will assume, for the sake of the discussion in the text, that the sale of Miller products in Middlesex and Somerset counties qualifies as "some appreciable part of interstate commerce".

15. It should also be observed that it is a matter of some doubt whether a manufacturer of a branded product, not alleged to be unique or dominant, can ever be found liable for conspiring to monopolize sales of its own product. *See Salco Corp. v. General Motors Corp., Buick Motor Div.,* 517 F.2d 567, 576 (10th Cir. 1975).

16. 15 U.S.C. § 13(a) provides in relevant part: It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States . . ., and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: *Provided,* That nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered: . . . *And provided further,* That nothing herein contained shall prevent persons engaged in selling goods, wares, or merchandise in commerce from selecting their own customers in bona fide transactions and not in restraint of trade: *And provided further,* That nothing herein contained shall prevent price changes from time to time where in response to changing conditions affecting the market for or the marketability of the goods concerned, such as but not limited to actual or imminent deterioration of perishable goods, [or] obsolescence of seasonal goods . . . . (Emphasis in original.)

1975), *cert. denied*, 424 U.S. 968, 96 S.Ct. 1466, 47 L.Ed.2d 736 (1976); *Refrigeration Eng'r Corp. v. Frick Co.*, 370 F.Supp. 702, 712 (W.D.Tex.1974); *Bel Air Markets v. Foremost Dairies, Inc.*, 55 F.R.D. 538, 540–41 (N.D.Cal.1972). There is nothing in the record to indicate that the plaintiff has been in competition with any of the Eastern Region distributors, except for Warren. Thus, the only relevant differential is that between the plaintiff and Warren.

A second and more serious difficulty with the fourth contention is that courts are very reluctant to find that credit differentials amount to violations of § 2(a). *See, e. g., Craig v. Sun Oil Co., supra,* 515 F.2d at 224; *Lang's Bowlarama, Inc. v. AMF Inc.,* 377 F.Supp. 405, 408–09 (D.R.I.1974). Indeed, the plaintiff has not cited, nor has this Court been able to find, any case which has made such a finding.

> It is obvious that differences in the borrower's financial strength, business experience, and many other factors bring about differences in the terms of credit, security required, guarantees, and other devices used by creditors under these circumstances.

*Craig v. Sun Oil Co., supra,* 515 F.2d at 224. Given the numerous business stresses which may affect credit terms, discrimination in credit terms must be of an extreme magnitude or nature before it can be the basis for a claim under § 2(a). *See id.*

■ It does not appear from the current record that the plaintiff will be able to establish that Miller's discrimination in credit terms was of such an extreme magnitude or nature as to constitute a violation of § 2(a). In fact, it seems more likely that Miller will be able to show that its terms of sale to the plaintiff derived from legitimate business reasons. Accordingly, no preliminary injunction can be based on the plaintiff's fourth contention.

■ The plaintiff's fifth contention is that Miller's termination of the plaintiff's franchise would be a violation of § 5 of the New Jersey Franchise Practices Act.[17] Specifically, the plaintiff argues that the stated reason for termination contained in Miller's telegram of May 4th, 1976, cannot, as a matter of law, constitute "good cause" within the meaning of the Act.[18] In other words, the plaintiff contends that "ceasing delivery of Miller products in Middlesex and Somerset count[ies]" does not amount to "failure by the franchisee to substantially comply with those requirements imposed upon him by the franchise".[19]

---

**17.** N.J.Stat.Ann. 56:10–5 provides in relevant part:

> It shall be a violation of this act for any franchisor directly or indirectly through any officer, agent, or employee to terminate, cancel, or fail to renew a franchise without having first given written notice setting forth all the reasons for such termination, cancellation, or intent not to renew to the franchisee at least 60 days in advance of such termination, cancellation, or failure to renew . . . . . It shall be a violation of this act for a franchisor to terminate, cancel or fail to renew a franchise without good cause. For the purposes of this act, good cause for terminating, canceling, or failing to renew a franchise shall be limited to failure by the franchisee to substantially comply with those requirements imposed upon him by the franchise.

**18.** The May 4 telegram—*see* Complaint, Exhibit 6—accomplished two things: (1) it notified the plaintiff of Miller's intent to terminate the franchise, and (2) it stated the reason for termination. Thus, the telegram was sufficient to

satisfy the requirements of the first sentence of § 5.

**19.** There is no dispute that the plaintiff in fact ceased delivery of Miller products in Middlesex and Somerset counties as of May 1, 1976, pursuant to a non-competition agreement with Warren Distributing Co. There is, however, heated controversy over whether Miller can rely on this undisputed fact as the reason for terminating the plaintiff's franchise.

During the course of these proceedings, Miller has attempted to assert other reasons for termination. These additional reasons will not be considered at this time because § 5 requires that "all the reasons for such termination" be set forth in the notice of termination. In *Amerada Hess Corp. v. Quinn,* 143 N.J.Super. 237, 245, 362 A.2d 1258, 1261 (L.Div.1976); the court permitted the assertion of an additional reason at the time of trial. However, the court never addressed itself to the question of whether this was an appropriate procedure. Moreover, the reason added at the time of trial played no part in the court's ultimate decision. We think that it is more consistent with the

The delivery of Miller products in Middlesex and Somerset counties is clearly a crucial requirement of the plaintiff's franchise. *See, e. g.*, Distributorship Agreement, "Purpose of Agreement"; *id.* ¶¶ 2, 3(e); *id.* "Schedule II". However, the plaintiff argues that the establishment of a dual distributorship [20] effectively expunged that requirement from the contract. No authority is cited in support of this proposition. The plaintiff relies solely upon the following line of reasoning: The custom and usage in the trade considered the "area of primary responsibility" [21] to be an exclusive area. Thus, Miller's action in establishing a dual distributorship was, in effect, a breach of contract which absolved the plaintiff of any obligation to service Middlesex and Somerset counties.

The weakness in this argument is the assertion that the area of primary responsibility is an exclusive area. It is not obvious that the plaintiff will be able to demonstrate the existence of a clear-cut custom and usage in the trade. There is evidence that dual distributorships—at least in some product lines—are not unknown in the Miller distribution system. Although an officer and a former officer of the plaintiff corporation testified that they considered the area of primary responsibility to be an exclusive area, and their understanding is relevant to interpretation of the contract, *see* 2 A. Corbin, Corbin on Contracts § 528 (1950), it must also be shown that Miller knew or had reason to know of their understanding. *See* 3 *id.* § 537. Finally, even if a custom or usage could be proved, the franchise agreement itself states that the area of primary responsibility "is not to be regarded as being exclusively Distributor's territory unless otherwise required by applicable law or regulation". *See* Distributorship Agreement, "Schedule II". Given this plain and unambiguous language, there does not appear to be any room for an implication or an inference that the parties contemplated the creation of exclusive territorial rights in the plaintiff. *See Independent Oil Workers v. Mobil Oil Corp.*, 441 F.2d 651, 653 n.4 (3d Cir. 1971).

Thus, it does not appear that the provision for an area of primary responsibility can be read out of the contract. Therefore, the plaintiff's cessation of delivery in Middlesex and Somerset counties is a failure to comply with an important requirement imposed by the franchise. This seems to be precisely the type of situation which would give rise to "good cause" for termination within the meaning of the Franchise Practices Act.

> Plainly, noncompliance by a franchisee with his reasonable franchise obligations, resulting in an actual or potential adverse effect upon the sales of the franchisor's products, would constitute substantial noncompliance thereof for purposes of termination, impairing as it does the franchisor's fundamental reason for initially entering into the relationship.

*Amerada Hess Corp. v. Quinn*, 143 N.J.Super. 237, 256, 362 A.2d 1258, 1269 (L.Div. 1976). Because it appears that Miller will be able to establish the existence of good cause for termination, no preliminary injunction can be based on the plaintiff's fifth contention.[22]

---

statutory language and policy to prohibit the assertion of additional reasons subsequent to the notice of termination. If Miller insists on relying on additional reasons, it should serve a new notice of termination on the plaintiff. Of course, this would require Miller to wait an additional 60 days before terminating the plaintiff's franchise.

**20.** *See* note 1 *supra.*

**21.** *See* note 2 *supra.*

**22.** In its briefs, the plaintiff raises an additional argument in connection with the fifth contention. The plaintiff apparently interprets the stated reason for termination in Miller's May 4 telegram—*see* text accompanying note 18 *supra*—as an allegation that the plaintiff transferred an interest in its franchise without Miller's approval, in violation of § 6 of the Franchise Practices Act, N.J.Stat.Ann. § 56:10-6:

> It shall be a violation of this act for any franchisee to transfer, assign or sell a franchise or interest therein to another person unless the franchisee shall first notify the franchisor of such intention by written notice setting forth in the notice of intent the prospective transferee's name, address, statement of financial qualification and business

Finally, in its sixth contention the plaintiff asserts that Miller imposed unreasonable standards of performance on the plaintiff, in violation of § 7(e) of the Franchise Practices Act.[23] The plaintiff cites the following as the unreasonable standards:

(a) the plaintiff was required to operate without the normal credit extended to other distributors in New Jersey;

(b) the plaintiff was required to pay for beer in advance of delivery;

(c) the plaintiff was required to adhere strictly to an arbitrary order and payment schedule;

(d) the plaintiff was required to operate under Miller's allocation system, while other distributors were not so burdened;

(e) the plaintiff was required to wait undue periods of time for the delivery of beer because Miller rerouted shipments to the plaintiff;

(f) the plaintiff was required to negotiate at a disadvantage with Warren Distributing Co. because of Miller's interference; and

(g) the plaintiff was required to compete with Warren because Miller established a dual distributorship in violation of a trade custom or usage.

This contention must be rejected at this time because the Court is not convinced that the plaintiff will succeed in showing that Miller's conduct with respect to the above-listed problems was unreasonable, given the plaintiff's financial condition and Miller's own business practices and capabilities and contractual obligations.[24] Furthermore, it should be noted that not all of the listed items can be considered "standards of performance" within the meaning of § 7(e). In addition, there is a serious question of remedy: it is not clear that a court should enjoin the termination of a franchise on the ground that there have been violations of § 7(e), when the stated reason for termination is unrelated to the allegedly unreasonable standards of performance.

In conclusion, it does not appear that the plaintiff has demonstrated a reasonable

---

experience during the previous 5 years. The franchisor shall within 60 days after receipt of such notice either approve in writing to the franchisee such sale to proposed transferee or by written notice advise the franchisee of the unacceptability of the proposed transferee setting forth material reasons relating to the character, financial ability or business experience of the proposed transferee. If the franchisor does not reply within the specified 60 days, his approval is deemed granted. No such transfer, assignment or sale hereunder shall be valid unless the transferee agrees in writing to comply with all the requirements of the franchise then in effect.

The plaintiff's response to its interpretation of the telegram is that Miller failed to advise the plaintiff in writing that Warren was an unacceptable transferee, as required by § 6. The plaintiff suggests that the burden was on Miller to disapprove in writing, and that absent such written disapproval the plaintiff was free to act. The plaintiff also suggests that Miller could not find Warren unacceptable, because Miller had just demonstrated its approval of Warren in the creation of the dual distributorship in Middlesex and Somerset counties.

This Court rejects the strained interpretation placed upon the termination notice by the plaintiff. Therefore, it is unnecessary to analyze the plaintiff's response to this interpretation. However, it may be observed that the plaintiff's remarks about § 6 give rise to a number of questions.

First, it is not clear that violations of § 6 would constitute good cause for termination under § 5, because § 5 limits "good cause" to failure to comply with the franchise agreement. Thus, it appears that violations of § 6 would not constitute good cause unless the franchise agreement required compliance with § 6. *See generally Amerada Hess Corp. v. Quinn, supra* note 18. *See also* Distributorship Agreement, ¶ 1(e). Second it is not clear that the plaintiff's agreement with Warren would constitute the transfer of an interest in a franchise for the purposes of § 6. Finally, assuming *arguendo* that § 6 applies, it is not clear from the current record that plaintiff first notified Miller in writing of the intent to transfer, so as to give rise to Miller's obligation to respond in writing.

**23.** N.J.Stat.Ann. § 56:10–7(e) provides:

It shall be a violation of this Act for any franchisor, directly or indirectly, through any officer, agent or employee, to . . . impose unreasonable standards of performance upon a franchisee.

**24.** *See, e. g.,* Distributorship Agreement, ¶¶ 1(a), 2, 4, 6, 8, 9, 13.

probability of ultimate success on the merits with respect to any of its contentions.[25] Because such a showing is essential to the issuance of a preliminary injunction, the plaintiff's motion for a preliminary injunction must be denied.

The foregoing opinion shall be considered the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a). An appropriate order will be submitted.

25. Given this disposition, it is unnecessary to discuss the three other factors that are ordinarily considered upon a motion for preliminary injunction.