## FEDERAL PAPER BOARD COMPANY, INC.

v.

Giacinto (a/k/a Jesse) P. AMATA, Harold Kirstein, United Paper and Metal Co., Inc., International Reclamation Corp., Connecticut Recycling Company, Inc., James D. Hershman, I. Hershman & Co., Inc., David Goodman, Tri–City Recycling, Inc., Harry Goodman, Inc., Capital Fibers, Harvey Lurie, Wilmington Paper Corp., Tessa Industries, Inc., James A. Derrico, Sr., Tiffany Fibers, Inc., James A. Derrico, Jr., Automated Material Handling, Inc., Kimberly Kirker and James Kirker, Trustee.

Civ. No. H–86–1415 (MJB).

United States District Court,
D. Connecticut.

Feb. 10, 1988.

George E. O'Brien, Christopher F. Wanat, Mark V. Connolly, John W. O'Meara, Tyler, Cooper & Alcorn, New Haven, Conn., for plaintiff.

William R. Moller, Hartford, Conn., Jacob D. Zeldes, David P. Atkins, Zeldes, Needle & Cooper, Bridgeport, Conn., Eliot Gersten, Hartford, Conn., David L. Belt, Ira B. Grudberg, Alice Miskimin, New Haven, Conn., John Wirzbicki, Milton Jacobson, Norwich, Conn., Hugh F. Keefe, New Haven, Conn., Henry B. Hurvitz, Carl Yeich, Hartford, Conn., V. James Ferraro, New Haven, Conn., for defendants.

## RULING ON MOTIONS TO DISMISS

BLUMENFELD, Senior District Judge.

This case arises out of alleged bribes and kickbacks paid to Federal Paper Board Company's former employee, Giacinto P. Amata. The amended complaint alleges violations of section 1 of the Sherman Act (Count I), section 2 of the Sherman Act (Count II), section 2(c) of the Robinson–Patman Act (Count III), and RICO (Count IV), along with several violations of state law (Counts V to XII). This ruling responds to the motions of defendants James D. Hershman and I. Hershman & Co., Inc. ("Hershman") (as to Counts I to IV), Automated Material Handling, Inc. and James A. Derrico, Jr. ("Automated") (as to all counts), David Goodman, Tri–City Recycling Co., Inc., Harry Goodman, Inc., and Capital Fibers ("Goodman") (as to all counts), Harold Kirstein, United Paper and Metal Co., Inc., International Reclamation Corp., and Connecticut Recycling Co., Inc. ("Kirstein") (as to Counts I to IV), James A. Derrico, Sr. and Tiffany Fibers, Inc. ("Tiffany") (as to all counts), and Giacinto P. Amata ("Ama-

ta") (as to Counts I to IV) to dismiss Federal's amended complaint.

The motions have been brought both as motions to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and as motions for judgment on the pleadings pursuant to Rule 12(c). With respect to those defendants that have filed pleadings, the motions are properly treated as motions for judgment on the pleadings.[1] *See Falls Riverway Realty, Inc. v. City of Niagara Falls,* 754 F.2d 49, 53 (2d Cir. 1985). The standards that apply to a motion to dismiss for failure to state a claim brought under Rule 12(b)(6) are the same as the standards for deciding a motion for judgment on the pleadings for failure to state a claim brought under Rule 12(c), as authorized by Rule 12(h)(2). *See Andreo v. Friedlander, Gaines, Cohen, Rosenthal & Rosenberg,* 660 F.Supp. 1362, 1365 (D.Conn.1987) [hereinafter *Andreo II* ]. For purposes of this ruling, therefore, all well-pleaded allegations of Federal will be taken to be true, *see* 2A J. Moore, J. Lucas & G. Grotheer, *Moore's Federal Practice* ¶ 12.15 at 12–106 (2d ed. 1987), and Federal's claims will not be dismissed "unless it appears 'beyond doubt that [Federal] can prove no set of facts in support of [its] claim[s] which would entitle [it] to relief.' " *Goldman v. Belden,* 754 F.2d 1059, 1065 (2d Cir.1985) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957) (footnote omitted)).

### Allegations

The amended complaint alleges the following facts. Federal Paper Board Company, Inc. ("Federal") is a New York corporation with executive offices in New Jersey. Federal manufactures and sells wood and paper products, including recycled paperboard and paperboard cartons. Federal's claims in this case relate to Federal's manufacture and sale of recycled paperboard at its mill in Sprague, Connecticut. Recycled paperboard is produced principally from wastepaper and is used to make folding paperboard cartons.

---

1. Answers have been filed by the Kirstein group and Amata.

From 1970 to 1985, Giacinto P. Amata was responsible for purchasing the wastepaper used as the raw material at the Sprague mill. Federal expected Amata "to purchase wastepaper for Federal at the most advantageous price and delivery terms, from the numerous competing suppliers of wastepaper." In 1985, Federal discovered that Amata had been accepting bribes and kickbacks from the wastepaper suppliers with whom he had been dealing (including defendants Hershman, Automated, Goodman, Kirstein, and Tiffany). Federal alleges that Amata would not permit wastepaper suppliers who refused to pay him bribes to sell in significant amounts to the Sprague mill and that Amata suggested to the uncooperative suppliers that they sell their wastepaper to Amata's favored suppliers who would then resell the wastepaper to Federal at a higher price. By 1985, Amata had concentrated the purchases of wastepaper so that the majority of the Sprague mill's wastepaper came from the suppliers making payments to Amata. The cost of the bribes was passed on to Federal through the price charged for wastepaper sold to the Sprague mill. Following Amata's discharge, Federal was able to purchase wastepaper at more favorable prices from a wider source of suppliers.

In connection with Federal's claim under section 1 of the Sherman Act, Federal alleges that Amata entered into conspiracies "between and among" the defendant wastepaper suppliers for the purposes of gaining commercial advantage, fixing prices of wastepaper supplied to the Sprague mill, and restraining competition. In connection with its Robinson–Patman Act claim, Federal alleges that the payments received by Amata were not for bona fide services rendered, but were commercial bribes. In connection with its RICO claim, Federal alleges that Amata "conspired, established, conducted, and participated" with the defendant wastepaper suppliers, both individually and as a group, in enterprises engaged in a pattern of racketeering activity. Federal also alleges that Amata participated in the affairs of Federal through a pattern of racketeering activity. The purposes of the alleged enterprises included fixing the price of wastepaper supplied to the Sprague mill, reducing competition among the suppliers of wastepaper to the Sprague mill, and defrauding Federal. As predicate acts for the RICO count, Federal alleges violations of the federal mail fraud and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343 (1982), and the Hobbs and Travel Acts, 18 U.S.C. §§ 1951 and 1952 (1982 & Supp. IV 1986).

## Discussion

### I. Sherman Act Count

Federal alleges a violation of section 1 of the Sherman Act, which provides in relevant part:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

15 U.S.C. § 1 (1982).[2] Defendants assert that Federal has failed to state a claim under section 1 of the Sherman Act.[3] In particular, they argue that Federal has failed to plead a *per se* violation of the act or an injury to competition, and that it has inadequately alleged a relevant market or a conspiracy.

■ Although section 1 of the Sherman Act on its face prohibits every restraint of trade, the Supreme Court has long held that section 1 prohibits only unreasonable restraints on trade. *See Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977). "[A] restraint may be adjudged unreason-

---

**2.** Standing to sue for violations of the Sherman Act is provided by section 4 of the Clayton Act. Section 4 gives the right to bring a treble damages action to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15(a) (1982). The standing doctrine is discussed in more detail *infra* at part II. B.

**3.** Count II of the amended complaint, alleging a violation of section 2 of the Sherman Act, was dismissed without prejudice by stipulation at oral argument, April 9, 1987, and is therefore not considered in this ruling.

able either because it fits within a class of restraints that has been held to be *'per se'* unreasonable, or because it violates what has come to be known as the 'Rule of Reason'...." *Federal Trade Comm'n v. Indiana Fed'n of Dentists*, 476 U.S. 447, 457–58, 106 S.Ct. 2009, 2017, 90 L.Ed.2d 445 (1986). Under the rule of reason, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T.V.*, 433 U.S. at 49, 97 S.Ct. at 2557. A particular restraint on trade is unreasonable if its anticompetitive effects outweigh its procompetitive effects. *International Distribution Centers, Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 793 (2d Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987). Some forms of conduct, however, "because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. The principle of *per se* unreasonableness ... avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken." *Northern Pac. Ry. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).[4] *Per se* rules of liability involve generalizations about the social utility of certain practices, but as with a claim under the rule of reason, the ultimate issue in a claim of *per se* liability is whether the challenged conduct is an unreason-

able restraint of trade. *See Arizona v. Maricopa County Medical Soc'y*, 457 U.S. 332, 344 & n. 16, 102 S.Ct. 2466, 2473 & n. 16, 73 L.Ed.2d 48 (1982).

## A. Impact on Competition is Essential To a Sherman Act Claim

A determination of the reasonableness of defendants' conduct, whether through detailed analysis under the rule of reason or through classification of the conduct as a *per se* violation of section 1, is only significant if there has been a showing that the defendants' conduct had some negative impact on competition in a relevant market. The rule of reason and the *per se* rules are simply different approaches to the issue of reasonableness once a restraint on trade has been found, *see NCAA v. Board of Regents of the Univ. of Okla.*, 468 U.S. 85, 103, 104 S.Ct. 2948, 2961, 82 L.Ed.2d 70 (1984), and both approaches presuppose the presence of an anticompetitive impact. It is not necessary to engage in a balancing of pro and anticompetitive effects under the rule of reason if there is "no anticompetitive effect at all." *Columbia Broadcasting Sys. v. American Soc'y of Composers, Authors and Publishers*, 620 F.2d 930, 934, 939 (2d Cir.1980), *cert. denied,* 450 U.S. 970, 101 S.Ct. 1941, 67 L.Ed.2d 621 (1981). " *'Proof that the defendant's activities had an impact upon competition in a relevant market is an absolutely essential element of the rule of reason case.'* " *Hayden Publishing Co. v. Cox Broadcasting Corp.*, 730 F.2d 64, 69–70 (2d Cir.1984) (quoting *Kaplan v. Burrough Corp.*, 611 F.2d 286, 291 (9th Cir.1979), *cert. denied,* 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980)) (emphasis added). Similarly, although the plaintiff's burden of

---

**4.** At first glance, it might appear that the arrangements alleged by Federal should be treated as *per se* violations of the Sherman Act since Federal has alleged conspiracies among Amata and the wastepaper suppliers with the purpose "to fix prices and elements of prices for the supply of wastepaper to Federal's Sprague mill," and "[a] horizontal agreement to fix prices is the archetypal example of [a *per se* violation]." *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647, 100 S.Ct. 1925, 1927, 64 L.Ed.2d 580 (1980) (per curiam). "The mere attachment of a *per se*

label" by Federal, however, "does not automatically invoke the *per se* doctrine." *Bunker Ramo Corp. v. United Business Forms, Inc.*, 713 F.2d 1272, 1284 (7th Cir.1983). "The defendants' conduct must be analyzed to determine whether it should receive *per se* treatment." *Id.* As the text makes clear, because Federal has not alleged facts from which this court can infer a restraint on competition, the defendants' conduct does not amount to a *per se* violation of section 1.

proof is reduced considerably if the defendants' conduct is placed in the *per se* category, *see Northern Pac. Ry.*, 356 U.S. at 5, 78 S.Ct. at 518, it is still essential to allege conduct which results in some restraint on trade in order to maintain a claim of *per se* liability. "[I]n characterizing ... conduct under the *per se* rule, our inquiry must focus on whether the effect and ... the purpose of the practice are to threaten the proper operation of our predominantly free-market economy—that is, whether the practice facially appears to be one that would always or almost always tend to restrict competition...." *Broadcast Music, Inc. v. CBS*, 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562, 60 L.Ed.2d 1 (1979) (citation and footnote omitted). *See also Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 16, 104 S.Ct. 1551, 1560, 80 L.Ed.2d 2 (1984) ("[A]s a threshold matter there must be a substantial potential for impact on competition in order to justify *per se* condemnation.").[5] In sum, "[e]very antitrust suit should begin by identifying the ways in which a challenged restraint might possibly impair competition. This step occasionally reveals that competition is not implicated at all and thus that the parties' dispute is not an antitrust case." 7 P. Areeda, *Antitrust Law* ¶ 1503a at 372 (1986) (footnote omitted). If a plaintiff fails to allege any anticompetitive impact, dismissal is proper. *See Bunker Ramo*, 713 F.2d at 1285 (dismissing complaint where "[p]laintiff [had] not alleged any anticompetitive effect arising from the defendants' conduct," and the court could not "infer such an effect from the facts alleged"). To avoid dismissal, Federal "must allege that competition in a *specific market* has been restrained." 7 P. Areeda, *Antitrust Law* ¶ 1502 at 371 (1986) (emphasis added).

Such an examination of the anticompetitive impact that the defendants' alleged conduct might have had requires a definition of the relevant market. "[A]n antitrust policy divorced from market considerations would lack any objective benchmarks," *Continental T.V.*, 433 U.S. at 53 n. 21, 97 S.Ct. at 2559 n. 21, and "[w]ithout market analysis, the competitive impact of the challenged restraint cannot be assessed," *Business Foods Serv., Inc. v. Food Concepts Corp.*, 533 F.Supp. 992, 996 (E.D.N.Y.1982). In *Carlo C. Gelardi Corp. v. Miller Brewing Co.*, 421 F.Supp. 237 (D.N.J.1976), the court provided a succinct definition of relevant market:

> The relevant market is comprised of a geographic and a product market. The geographic market encompasses the area in which the defendant effectively competes with other individuals or businesses for the distribution of the relevant product. The relevant product market is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered.

*Id.* at 243 (citations omitted).

### B. Federal's Allegations of Anticompetitive Impact

 Federal's Sherman Act claim must fail because Federal has not alleged facts that establish an injury to competition in a relevant market. Amata's demand for and receipt of bribes and his redirection of the wastepaper supply through cooperative suppliers may have injured Federal, but it does not, standing alone, constitute an injury to competition. Assuming *arguendo* that the relevant market in this case is the market alleged by Federal, that is the supply of wastepaper to be used in making paperboard by Federal at its Sprague mill,[6]

---

**5.** Because *per se* liability is predicated on the existence of a substantial threat to competition, the *"[p]er se* rules may require considerable inquiry into market conditions before the evidence justifies a presumption of anticompetitive conduct." *NCAA*, 468 U.S. at 104 n. 26, 104 S.Ct. at 2962 n. 26.

**6.** Although the definition of relevant market is most often a question of fact, *see Hayden Publishing Co.*, 730 F.2d at 70 & n. 8, except in

unusual circumstances a single purchaser cannot usually constitute a relevant geographical market, *see Jayco Sys., Inc. v. Savin Business Mach. Corp.*, 777 F.2d 306, 319 & n. 43 (5th Cir.1985), *cert. denied*, 479 U.S. 816, 107 S.Ct. 73, 93 L.Ed.2d 30 (1986). Since the court finds that there has been no anticompetitive effect in the market alleged by Federal, however, it is not necessary to consider whether Federal's allegation of a single-purchaser market is insufficient as a matter of law.

competition in that market would arise in two ways. First, there would be competition among suppliers for sales to Federal. Second, there would be Federal's efforts to make purchases on competitive terms with the various suppliers. With respect to each of these aspects of market competition, the requisite impact on competition is lacking.

### 1. Anticompetitive Effect on Competition for Sales to Federal

■ The amended complaint fails to allege an injury to competition with respect to the ability of wastepaper suppliers to compete against each other for sales to Federal. The payment of bribes by suppliers to a purchasing agent does not by itself establish an anticompetitive effect. Although the bribes may have been illegal and unfair methods of competition, their illegality and unfairness does not support an inference that the bribes restrained competition. On the contrary, bribery could have been consistent with intense competition among the suppliers—some of which resorted to illegal measures to gain an advantage. Indeed, it is ironic that, in addition to its antitrust claims, Federal has brought a claim under the Connecticut Unfair Trade Practices Act, Conn.Gen.Stat. Ann. §§ 42–110a to –110q (West 1987) (as amended by 1987 Conn.Acts 297 (Reg. Sess.)). The Sherman Act is intended to protect competition, "whereas '[u]nfair competition is still competition and the purpose of the law of unfair competition is to impose restraints on that competition.'" *Mid–West Underground Storage, Inc. v. Porter*, 717 F.2d 493, 497 (10th Cir.1983) (quoting *Northwest Power Prods., Inc. v. Omark Indus., Inc.*, 576 F.2d 83, 88 (5th Cir.1978), *cert. denied*, 439 U.S. 116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979)). The fact that Amata dealt primarily with suppliers who paid him bribes does not mean that the uncooperative sellers could no longer compete. For example, they might have informed Federal about Amata's behavior. In any event, without allegations of additional facts that demonstrate how those suppliers were precluded from taking competitive actions in order to secure sales with Federal, the amended complaint does not sufficiently allege anticompetitive effect.[7]

■ In order to establish an anticompetitive effect adequate to avoid dismissal, it is not sufficient to allege an injury to a competitor. *See Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (antitrust laws designed to protect competition not competitors). Rather, "[t]he inquiry under the rule of reason is directed at the challenged restraint's overall impact on competitive conditions, rather than whether a particular party has been restrained by the conduct at issue." *Berman Enter., Inc. v. Local 333, United Marine Div., Int'l Longshoremen's Ass'n*, 644 F.2d 930, 937 (2d Cir.), *cert. denied*, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 381 (1981). *See also NCAA*, 468 U.S. at 104 ("Under the Sherman Act the criterion to be used in judging the validity of a restraint on trade is its impact on competition.").

### 2. Antitrust Injury to Federal

■ As regards Federal's ability to buy wastepaper on competitive terms, the court finds nothing in the amended complaint which indicates that the kickback arrangements between Amata and some of the wastepaper suppliers foreclosed Federal from negotiating purchases with individual suppliers. Put another way, Federal has not suffered any antitrust injury with respect to its Sherman Act claim.[8] Amata

---

7. This court also finds that Amata's refusal to purchase from the wastepaper suppliers that were unwilling to pay him bribes does not amount to a refusal to deal as in *Klor's, Inc. v. Broadway–Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), where a refusal to deal was held to be a monopoly forbidden by the antitrust laws. *Klor's* involved a concerted refusal by "manufacturers, distributors and a retailer" to deal with the petitioner. *Id.* at 213,

79 S.Ct. at 710. Amata's actions, by contrast, amounted at most to "a single trader refusing to deal with another," a scenario that the Court in *Klor's* distinguished from the group boycott. *See id.* at 212, 79 S.Ct. at 709.

8. An antitrust injury is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick*, 429 U.S. at 489, 97 S.Ct.

did not control Federal, nor is there any allegation that Amata and the suppliers paying him bribes could have prevented any other supplier from dealing with Federal had Federal attempted to purchase from such other supplier. A fair reading of the amended complaint indicates that the potential existed for Federal to obtain competitive prices from a wide range of suppliers. Of course, Amata's disloyalty and Federal's ignorance thereof resulted in depriving Federal from actually obtaining the benefits of competition among wastepaper suppliers. Nevertheless, there is no allegation that Federal could not have obtained the benefits of competition had it tried to do so. Indeed, as mentioned above, when Federal terminated Amata it did gain the benefits of a competitive market. When the only source of its injury is a disloyal employee, a plaintiff cannot complain of an

antitrust injury in order to elevate claims based on an employee's breach of fiduciary duty into Sherman Act claims. The absence of an antitrust injury is fatal to Federal's section 1 claim because in this case, where the alleged misconduct involved several suppliers selling to one purchaser, the lack of an antitrust injury to the purchaser reveals that the defendant's activities did not have *any* anticompetitive effect at all in the relevant market. If a purchaser like Federal has the opportunity to buy from competing sellers at competitive prices, that purchaser cannot make the necessary showing that competition has been restrained. Since Federal cannot establish an "impact on competitive conditions," *Berman Enter.*, 644 F.2d at 937, defendants' conduct does not amount to a Sherman Act violation under the rule of reason or the *per se* rules.[9]

at 698. Analysis of a plaintiff's antitrust injury is also relevant for determining whether that plaintiff has standing to sue for treble damages under section 4 of the Clayton Act. *See Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 250 (2d Cir.1985) (to have standing to bring an antitrust claim plaintiff must suffer an antitrust injury). The concept of antitrust injury and its relation to standing is discussed *infra* at part II. B.

The analysis of "antitrust injury" that this court undertakes with respect to Federal's Sherman Act claim should be distinguished from the "antitrust injury" analysis with respect to Federal's Robinson–Patman Act claim. As explained in the text *infra*, under section 2(c) of the Robinson–Patman Act there is no requirement that a plaintiff allege or prove antitrust injury or anticompetitive effect in order to establish a prima facie violation of section 2(c). The antitrust injury requirement for Federal's Robinson–Patman Act claim is imposed solely by common law standing doctrine. Moreover, since an antitrust injury is an "injury of the type the antitrust laws were intended to prevent," *Brunswick*, 429 U.S. at 489, 97 S.Ct. at 698, an antitrust injury for purposes of a claim arising under section 2(c) of the Robinson–Patman Act is different from an antitrust injury for purposes of a claim arising under section 1 of the Sherman Act. Section 1 of the Sherman Act is intended to protect free competition, *NCAA*, 468 U.S. at 104 & n. 27, 104 S.Ct. at 2962, so that a plaintiff's Sherman Act injury must reflect the anticompetitive consequences of the defendants' conduct, *see Brunswick*, 429 U.S. at 489, 97 S.Ct. at 698. Section 2(c) of the Robinson–Patman Act, on the other hand, was enacted to close a loophole in the price discrimination laws. *See*

*infra* part II. B. To establish antitrust injury for purposes of standing to sue for a violation of section 2(c), a plaintiff must show that the violation "adversely affected his ability to compete with favored competitors." *World of Sleep, Inc. v. La–Z–Boy Chair Co.*, 756 F.2d 1467, 1480 (10th Cir.), *cert. denied*, 474 U.S. 823, 106 S.Ct. 77, 88 L.Ed.2d 63 (1985).

**9.** There is no restraint in this case because the way was open to Federal to do business with individual suppliers. The fate of the blanket-license arrangement examined by the Supreme Court in *Broadcast Music* and on remand by the Second Circuit Court of Appeals in *Columbia Broadcasting System* provides a more sophisticated example of this concept. The blanket licenses at issue gave the licensees "the right to perform any and all of the compositions owned by the members or affiliates [of the American Society of Composers, Authors and Publishers and Broadcast Music, Inc.] as often as the licensees desired for a stated term." *Broadcast Music*, 441 U.S. at 5, 99 S.Ct. at 1555. In *Broadcast Music*, the Court refused to apply *per se* analysis to the blanket-license arrangement. *Id.* at 24, 99 S.Ct. at 1564. The Court observed that "[t]he individual composers and authors have neither agreed not to sell individually in any other market nor use the blanket license to mask price fixing." *Id.* at 23–24, 99 S.Ct. at 1564. As the Court later commented in *Maricopa County Medical Society*, 457 U.S. at 355, 102 S.Ct. at 2478, "[a]lthough there was little competition among individual composers for their separate compositions, the blanket-license arrangement did not place any restraint on the right of any individual copyright owner to sell his own compositions separately to any buyer at any price." On remand, the court of appeals examined the

In sum, Federal has alleged nothing more than commercial bribery. The amended complaint lacks additional allegations that might support a Sherman Act claim.[10] Other courts have also reached the conclusion that commercial bribery, standing alone, does not establish a violation of the Sherman Act. *See Bunker Ramo,* 713 F.2d at 1275, 1284–85;[11] *Calnetics Corp. v. Volkswagen of America, Inc.,* 532 F.2d 674, 687 (9th Cir.) (per curiam), *cert. denied,* 429 U.S. 940, 97 S.Ct. 355, 50 L.Ed.2d 309 (1976). Count I of the amended complaint must therefore be dismissed.

## II. *Robinson–Patman Act Count*

In Count III of the amended complaint, Federal alleges that defendants violated section 2(c) of the Robinson–Patman Act, which provides that:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid.

15 U.S.C. § 13(c) (1982). Defendants claim that Count III should be dismissed on the grounds that Federal has failed to allege an anticompetitive injury. The main thrust of defendants' argument is that an anticompetitive injury is both a necessary element of a violation of section 2(c) of the Robinson–Patman Act and a prerequisite to standing under section 4 of the Clayton Act, 15 U.S.C. § 15(a) (1982). Federal responds that it does not have to allege anticompetitive injury to sue under section 2(c), but if anticompetitive injury is required, it has alleged such injury.

A. Establishing a Prima Facie Violation Of Section 2(c) of the Robinson–Patman Act

■ The language of section 2(c) of the Robinson–Patman Act is broad enough to encompass the alleged payments to Amata

---

blanket-license arrangement under the rule of reason. *Columbia Broadcasting Sys.,* 620 F.2d at 932. After observing that the plaintiff CBS had never attempted to purchase songs from individual copyright owners, the court "agree[d] with the defendants that if that opportunity [to purchase from the individual owners] is fully available, and if the copyright owners retain unimpaired independence to set competitive prices for individual licenses to a licensee willing to deal with them, the blanket license is not a restraint of trade." *Id.* at 936. These cases demonstrate that anticompetitive effect is not to be blithely assumed.

10. The fact that the wastepaper suppliers were able to pass the cost of bribing Amata on to Federal and charge an excessive price for raw wastepaper does not mean there has been a restraint of trade for purposes of the Sherman Act. Presumably, the suppliers were able to pass these costs on to Federal because of Amata's willingness to bind Federal to purchase contracts that were not in Federal's interest in return for bribes and kickbacks. While it is true that every purchase negotiated by Amata "restrained" trade in that it involved the "fixing" of a price, the same is true of any contract between a buyer and a seller, and the Sherman Act has never been interpreted to impose a general prohibition on commercial contracts. *See NCAA,* 468 U.S. at 98, 104 S.Ct. at 2958; *United States v. Topco Assocs.,* 405 U.S. 596, 606, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972).

11. The facts of *Bunker Ramo* are similar to the facts in this case. In *Bunker Ramo,* the plaintiff alleged that one of its employees and a supplier had been engaged in a scheme in which the supplier submitted false invoices for goods never received by the plaintiff. The employee filled out false delivery receipts so that the plaintiff paid the supplier for the goods never received, and in return the employee received bribes from the supplier. 713 F.2d at 1275. The Seventh Circuit Court of Appeals reversed the district court's denial of the defendants' motion to dismiss the plaintiff's Sherman Act claim. The court found that bribing an agent as part of a scheme to defraud—without allegations of additional behavior by the defendants that might give rise to an antitrust violation—did not constitute a *per se* violation of the Sherman Act and was deficient under the rule of reason for lack of any anticompetitive effect. *Id.* at 1284–85. Although *Bunker Ramo* involved only one supplier, the logic of *Bunker Ramo* applies equally well to this case.

from the wastepaper suppliers. *See Seaboard Supply Co. v. Congoleum Corp.*, 770 F.2d 367, 372 (3d Cir.1985) (citing cases that have applied section 2(c) to schemes of commercial bribery). Payments were made to Amata, an agent of the buyer Federal, that were not for services rendered.[12] To require Federal to make additional allegations of anticompetitive effect in order to establish a prima facie violation of section 2(c) would be to impose a common law limitation on the broad language enacted by Congress. At least a few courts appear to have held that in order for payments to constitute a violation of section 2(c) the payments must have an anticompetitive effect. *See e.g., Allen Pen Co. v. Springfield Photo Mount Co.*, 653 F.2d 17, 25 (1st Cir.1981) (plaintiff must show that payments give a favored buyer a competitive advantage); *Bunker Ramo Corp. v. Cywan*, 511 F.Supp. 531, 533 (N.D.Ill.1981) (plaintiff must allege "competitive injury of the type which the Robinson–Patman Act was designed to protect against"). This court finds, however, that long-standing Second Circuit precedent and Supreme Court dicta refute any claim that competitive injury is an element of a violation of section 2(c) of the Robinson–Patman Act.

In *Biddle Purchasing Co. v. Federal Trade Comm'n*, 96 F.2d 687 (2d Cir.), *cert. denied*, 305 U.S. 634, 59 S.Ct. 101, 83 L.Ed. 407 (1938), the court of appeals was confronted with the argument that

> section 2(c) ..., under which this proceeding is brought, is to be construed in the light of section 2(a), and that, so construed, the payment or receipt of the brokerage is illegal only when it has such effect upon competition as is provided in section 2(a). The argument is that the

receipt of [payments] here would be illegal only if it restricts competition or restrains trade or injures a competitor. *Id.* at 690.[13] The court rejected this argument on the grounds that "[s]ection 2(c) contains no classification provision nor is there anything in it which would justify the conclusion that it would not be uniformly applied." *Id.* The court also held that the lack of a competitive injury requirement did not render section 2(c) unconstitutional. *Id.* at 690, 692. As the court of appeals later commented in *Grand Union Co. v. Federal Trade Comm'n*, 300 F.2d 92, 99 (2d Cir.1962), section 2(c) defines conduct that is *per se* illegal. As such, a plaintiff does not have to prove injury to competition. *Id.* The conclusion reached in *Biddle* is also supported by dicta in *Federal Trade Comm'n v. Simplicity Pattern Co.*, 360 U.S. 55, 79 S.Ct. 1005, 3 L.Ed.2d 1079 (1959). In *Simplicity Pattern*, the Court contrasted sections 2(c), (d), and (e) with section 2(a). *Id.* at 65, 79 S.Ct. at 1011. "Unlike § 2(a)," the Court wrote, "[neither § 2(c), (d), nor (e) ] requires, as proof of a prima facie violation, a showing that the illicit practice has had an injurious or destructive effect on competition." *Id.*[14]

**B. Standing**

Section 2(c) of the Robinson–Patman Act defines certain conduct as illegal. It does not, however, create a private right of action to sue for damages caused by violations of the act. Private plaintiff standing to sue for treble damages for violations of the Robinson–Patman Act is provided by section 4 of the Clayton Act.[15] *See Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 853 (2d Cir.1987). In order for Federal to maintain a Robinson-Patman Act claim,

---

**12.** The "services rendered" defense has been limited to services performed by the seller's own broker. Hansen, *Robinson–Patman Law: A Review and Analysis*, 51 Fordham L.Rev. 1113, 1156 (1983).

**13.** Section 2(a) of the Robinson–Patman Act prohibits price discrimination "where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit

of such discrimination, or with the customers of either of them." 15 U.S.C. § 13(a) (1982).

**14.** The Second Circuit is not alone in refusing to graft a competitive injury requirement onto section 2(c). *See, e.g., Seaboard Supply*, 770 F.2d at 372; *Metrix Warehouse, Inc. v. Daimler–Benz Aktiengesellschaft*, 716 F.2d 245, 247 (4th Cir. 1983).

**15.** Codified as amended at 15 U.S.C. § 15(a) (1982).

Federal must demonstrate that it has standing under section 4 of the Clayton Act and that it satisfies the common law tests for standing that have been developed to limit the scope of section 4.

■ If Federal does not have standing, its Robinson–Patman Act claim must be dismissed despite the fact that it has alleged conduct by the defendants that violates the act. Even though, as *Biddle* and *Simplicity Pattern* demonstrate, the defendants' conduct might support a Federal Trade Commission cease and desist order,[16] an additional inquiry into standing is necessary if Federal's claim for damages is to survive dismissal. For purposes of standing analysis, cases like *Biddle* and *Simplicity Pattern* are irrelevant. Those cases involved Federal Trade Commission enforcement actions in which the standing limitations on private plaintiff claims do not apply. *See Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.,* 824 F.2d 582, 600 (8th Cir.1987) (for purposes of standing analysis under section 4 of the Clayton Act, "citations to Federal Trade Commission enforcement actions are clearly inapposite").

Although standing requirements impose several hurdles for plaintiffs, "[t]he single most striking development in the law of private antitrust enforcement ... is the 'antitrust injury' concept associated with the Supreme Court's *Brunswick* decision...." P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 335.1 at 224 (Supp.1986). The reference is to *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), in which the Court examined a petitioner's attempt to sue for treble damages pursuant to section 4 of the Clayton Act for injury resulting from a merger in violation of section 7 of the Clayton Act.[17] To recover damages under section 4, the Court held that the petitioner had to do more than prove that the defendant violated section 7. *Id.* at 486, 97 S.Ct. at 696. In addition to proving a violation of the substantive antitrust law, "[p]laintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Id.* at 489, 97 S.Ct. at 698 (emphasis in original).

The *Brunswick* analysis has been applied to violations of the Robinson–Patman Act, and it governs Federal's claim for treble damages. In *J. Truett Payne Co. v. Chrysler Motors Corp.,* 451 U.S. 557, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981), the petitioner alleged a violation of section 2(a) of the Robinson–Patman Act.[18] In its analysis of the petitioner's claim, the Court noted that "[o]ur decision here is virtually governed by our reasoning in [*Brunswick* ]." *Id.* at 562, 101 S.Ct. at 1927. The petitioner had to prove more than just a violation of section 2(a), "since such proof establishes only that injury may result." *Id.* (quoting *Brunswick,* 429 U.S. at 486, 97 S.Ct. at 696). "To recover treble damages ... a plaintiff must make some showing of actual injury attributable to something the antitrust laws were designed to prevent." *Id.* The Court remanded the case to the court of appeals to determine whether the petitioner had produced sufficient evidence to support a finding of a violation of section 2(a). *Id.* at 568, 101 S.Ct. at 1930. If the court of appeals determined on remand that respondent violated section 2(a), it would then have to decide whether the petitioner had antitrust standing. *Id.* In the final paragraph of the opinion, the Court gave the court of appeals the following instruction: "[w]e emphasize that even if there has been a violation of the Robinson–Patman Act, petitioner is not excused

---

16. 15 U.S.C. § 45 (1982) empowers the Federal Trade Commission to order persons to cease and desist from using unfair methods of competition. Unfair methods "encompass[es] ... practices that violate the Sherman Act and the other antitrust laws." *Indiana Fed'n of Dentists,* 476 U.S. at 454, 106 S.Ct. at 2016.

17. Codified as amended at 15 U.S.C. § 18 (1982 & Supp. IV 1986).

18. *See supra* note 13.

from its burden of proving antitrust injury and damages." *Id.* Although *J. Truett Payne* involved section 2(a) of the Robinson–Patman Act, there is no reason why its analysis should not also apply to claims arising out of section 2(c) since in both instances the right to treble damages is granted by section 4 of the Clayton Act. *Cf. World of Sleep, Inc. v. La–Z–Boy Chair Co.,* 756 F.2d 1467, 1480 (10th Cir.) (holding that *J. Truett Payne* is "equally applicable to a plaintiff seeking damages for a violation of section 2(e) [of the Robinson–Patman Act] because such damages are also governed by section 4 of the Clayton Act, the damages provision construed in *J. Truett Payne* "), *cert. denied,* 474 U.S. 823, 106 S.Ct. 77, 88 L.Ed.2d 63 (1985).

*J. Truett Payne* makes it clear that Federal must allege an antitrust injury in order to have standing to sue for treble damages. Defining antitrust injury for purposes of claims arising out of section 2(c) of the Robinson–Patman Act is more difficult. Keeping in mind that an antitrust injury is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful," *Brunswick,* 429 U.S. at 489, 97 S.Ct. at 698, however, it is possible to formulate a meaningful test for antitrust injury in section 2(c) cases. "The Robinson–Patman Act was enacted in 1936 to curb and prohibit all devices by which large buyers gained discriminatory preferences over smaller ones by virtue of their greater purchasing power." *Federal Trade Comm'n v. Henry Broch & Co.,* 363 U.S. 166, 168, 80 S.Ct. 1158, 1160, 4 L.Ed.2d 1124 (1960). Section 2(c) was added to supplement section 2(a)'s prohibition on price discrimination and was primarily intended to attack indirect price discrimination through the use of "brokerage" payments to the agents of large buyers. The agents would pass the payments on to the buyers, giving the buyers an effective price reduction without violating section 2(a). *See id.* at 168–69, 171, 80 S.Ct. at 1160, 1161. Even though there is evidence in the legislative history that Congress may have additionally intended for section 2(c) to prohibit commercial bribery, *see id.* at 169 n. 6, 80 S.Ct. at

1161 n. 6, it appears that the main purpose of section 2(c) was to close the "brokerage" loophole in the laws regulating price discrimination. *See id.* at 171, 80 S.Ct. at 1161 (stating that section 2(c) of the Robinson–Patman Act "was enacted by Congress because § 2(a) was not considered adequate to deal with abuses of the brokerage function"). *See also Fuchs Sugar & Syrups, Inc. v. Amstar Corp.,* 447 F.Supp. 867, 881–82 (S.D.N.Y.1978) (discussing the legislative history of section 2(c)), *rev'd on other grounds,* 602 F.2d 1025 (2d Cir.), *cert. denied,* 444 U.S. 917, 100 S.Ct. 232, 62 L.Ed.2d 172 (1979). In light of the primary purpose of section 2(c), this court believes that the antitrust injury requirement of *Brunswick* and *J. Truett Payne* requires a plaintiff suing for treble damages for violations of section 2(c) to show "that the probable affect of the discrimination would be to allow the 'favored competitor to draw sales or profits from him, the unfavored competitor.' " *Best Brands Beverage, Inc. v. Falstaff Brewing Corp.,* 842 F.2d 578, 585 (2d Cir.1987) (quoting *J. Truett Payne,* 451 U.S. at 569–70, 101 S.Ct. at 1930–31 (Powell, J., dissenting in part)).

Professors Areeda and Hovenkamp reach a similar conclusion in their analysis of *J. Truett Payne.* The plaintiff in *J. Truett Payne,* a Chrysler automobile dealer, had challenged a Chrysler incentive program that paid bonuses to dealers who achieved certain sales quota. *See* 451 U.S. at 559–60, 101 S.Ct. at 1925–26. As part of its holding, the Court rejected the rule of "automatic damages" under which a plaintiff who proves a violation of section 2(a) is automatically entitled to damages in the amount of the price discrimination. Instead, as described above, the Court held that a plaintiff must make an additional showing of antitrust injury before he can recover damages for a violation of section 2(a). *Id.* at 561–63, 101 S.Ct. at 1927. According to Professors Areeda and Hovenkamp's "simplest reading of this decision," the automatic damage measure was defective because "[it] did not reflect any actual injury to the plaintiff, for the bonuses received by his rivals were not shown to have

been translated into any retail price cuts (or other activities) by his rivals that took business away from him." P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 335.2c at 233–34 (Supp.1986).

■] Applying these standards to this case, Federal's Robinson–Patman claim must be dismissed for lack of standing. Although Federal contends that it has suffered an "anticompetitive injury," the facts alleged in the amended complaint do not support a finding of antitrust injury sufficient to confer standing to sue for damages for violations of section 2(c). With respect to injury, Federal alleges (1) that the wastepaper suppliers passed the cost of bribing Amata on to Federal so that Federal paid more than it would otherwise have paid in the absence of the payments to Amata and (2) that the cost of wastepaper supplied to Federal's Sprague mill dropped after Amata's termination. The most this court is willing to infer from those allegations is that Federal's profits might have been lowered as a result of the bribes paid to Amata—and the court cannot even be certain about reduced profits since Federal may have been able to pass the additional

cost of wastepaper through to its customers. This court is unwilling to infer from the allegations in the amended complaint that the payments to Amata and the increased cost of wastepaper resulted in a price discrimination that disadvantaged Federal with respect to its competitors.[19] There is no allegation that other manufacturers of recycled paperboard were purchasing wastepaper from the same suppliers at a lower cost or that the alleged arrangements resulted in a transfer of profits from Federal to one of Federal's competitors. Nor is there any allegation that the higher cost of wastepaper supplied to the Sprague mill caused Federal to lose sales of the recycled paperboard manufactured from raw wastepaper or that the payments to Amata and the resulting overcharge to Federal allowed Federal's rivals in the recycled paperboard business to undercut Federal's prices and thereby increase their sales volume at Federal's expense.[20] Once again, Federal has tried to cast commercial torts in the language of antitrust in order to have a chance at treble damages. As with its Sherman Act claim, however, the facts alleged in the amended

19. Federal cites *Grace v. E.J. Kozin Co.*, 538 F.2d 170, 174 (7th Cir.1976), for the proposition that whenever bribery of a purchasing agent results in a higher price to the buyer there is injury "entitled to redress under Section 2(c)." Federal's reliance on that case is inapposite for two reasons. First, the case is easily distinguishable. *Grace* involved bribes paid by the defendant, a wholesaler of seafood, to a purchasing agent of another wholesaler, the plaintiff, in order to induce the plaintiff to purchase seafood from the defendant at unreasonably high prices. *Id.* at 172. Moreover, the two wholesalers shared some of the same customers. *Id.* Thus, the plaintiff and defendant were direct competitors in the same consumer market. Under those facts, it is possible to infer that the higher cost of seafood that the plaintiff paid as a result of the kickback scheme disadvantaged the plaintiff in its ability to compete with the defendant. In this case, however, Federal and the wastepaper suppliers do not compete, *see infra* note 20, and they do not share any of the same customers. Second, and more importantly, the court in *Grace*, which was decided before *Brunswick* and *J. Truett Payne*, appears to adopt the automatic measure of damages that the Supreme Court rejected in *J. Truett Payne*. *See Grace*, 538 F.2d at 174 (upholding the district court's award of damages in the amount of "commis-

sions" paid to the unfaithful purchasing agent). Indeed, *Grace* is cited by the Court in *J. Truett Payne* as a case approving the automatic damages theory. *See* 451 U.S. at 561 n. 2, 101 S.Ct. at 1927 n. 2. In light of the recent Supreme Court developments in the law of standing, it would be improper to rely on *Grace*.

20. In its briefs, Federal argues that it competes with the defendant wastepaper suppliers because—to the extent that the defendant suppliers went along with Amata and bought wastepaper from uncooperative suppliers and resold it to Federal—they competed with Federal to make purchases of wastepaper. This argument does not withstand close analysis and cannot provide the basis for finding that Federal has standing. The defendant suppliers, when they bought wastepaper from uncooperative sellers, bought the wastepaper in order to resell it to Federal. They were acting as brokers. Federal, however, has not made any allegation that it has been injured in its ability to compete with the defendant suppliers in *the brokerage business*. All that Federal has alleged is that it purchases wastepaper to recycle it into paperboard. Since Federal has not alleged that it brokers wastepaper, it cannot argue that it has been injured in its ability to compete in the wastepaper brokerage business.

complaint simply do not amount to an antitrust violation.

### III. *Rule 9(b)*

Defendants contend that the amended complaint fails to satisfy the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). "Malice, intent, knowledge, and other condition of mind," however, "may be averred generally." *Id.* Defendants argue (1) that the requirements of 9(b) apply to the entire complaint since "the allegations of conduct comprising the purported 'fraudulent schemes' are incorporated into *all* counts" and (2) that the entire amended complaint should be dismissed for failure to plead with sufficient particularity. Federal, on the other hand, argues that application of 9(b) is limited to Count IV (RICO) and Count VII (fraud by agent) since those are the only counts "that allege fraud" and that Rule 9(b) is satisfied with respect to those two counts.

■ Rule 9(b) must be satisfied with respect to a particular count whenever fraud is a necessary element of that count. *See In re LILCO Sec. Litig.*, 625 F.Supp. 1500, 1503 (E.D.N.Y.1986). If "fraud is not required for a [ ] claim, [that claim] need not be pleaded pursuant to Rule 9(b)." *Id.* Despite defendants' argument to the contrary, the mere fact that the transactions alleged in the amended complaint give rise to some claims grounded in fraud does not mean that all the claims rising out of the same transactions are subject to 9(b).

■ To the extent that the RICO count is based on predicate acts of mail and wire fraud, it must satisfy Rule 9(b). *See Andreo II*, 660 F.Supp. at 136. The sufficiency of the RICO pleading is discussed below. Count VII, alleging fraud by an agent, is also clearly covered by Rule 9(b).[21] The only other counts that might arguably trigger Rule 9(b) are Counts X and XI. Count

X, based on the Connecticut Unfair Trade Practices Act (CUTPA), Conn.Gen.Stat. Ann. §§ 42–110a to 110q (West 1987) (as amended by 1987 Conn. Acts 297 (Reg. Sess.)), alleges that the wastepaper suppliers engaged in "unfair and *deceptive* acts" in violation of section 42–110b. Fraud, however, is not a necessary element for a claim under the CUTPA, which is broader in scope than traditional common law remedies for fraud. *See Bailey Employment Sys., Inc. v. Hahn*, 545 F.Supp. 62, 66–67 (D.Conn.1982), *aff'd*, 723 F.2d 895 (2d Cir. 1983); *Hinchliffe v. American Motors Corp.*, 184 Conn. 607, 616–17, 440 A.2d 810, 815–16 (1981). Since Federal does not need to prove fraud in order to recover under Count X, Federal does not need to plead Count X pursuant to Rule 9(b). Count XI alleges that the wastepaper suppliers breached a contractual duty to deal in good faith. Under Connecticut law, a breach of good faith requires only a showing that a party was not "honest in fact." *Funding Consultants, Inc. v. Aetna Casualty & Sur. Co.*, 187 Conn. 637, 643, 447 A.2d 1163, 1165–66 (1982). That is a much lighter burden than is required for establishing fraud. *See Miller v. Appleby*, 183 Conn. 51, 54–55, 438 A.2d 811, 813 (1981) (listing the elements for an action in fraud). Again, since Federal need not prove fraud in order to recover under its breach of contract claim, Count XI need not be pleaded pursuant to Rule 9(b).

### IV. *RICO Count*

#### A. Sufficiency of Pleading of Predicate Acts

Defendants argue that the RICO count is inadequately pleaded under Rule 9(b). Without specifying under which subsection it is proceeding, Federal alleges a violation of section 1962 of RICO. There are two relevant subsections of section 1962 which will be considered in turn.

##### 1. *Section 1962(c)*

Section 1962(c) of RICO provides:

---

21. Since Count VII is directed only at Amata, who has not moved to have that count dismissed, the sufficiency of Count VII is not at issue in this motion.

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c) (1982). Racketeering activity is defined to include specific predicate offenses, including mail fraud indictable under 18 U.S.C. § 1341 and wire fraud indictable under 18 U.S.C. § 1343. The predicate acts of mail and wire fraud must be pleaded in conformity with the particularity requirements of Rule 9(b). *Andreo II*, 660 F.Supp. at 1368.[22]

The mail and wire fraud statutes prohibit "everything designed to defraud." *McNally v. United States*, 107 S.Ct. 2875, 2880 (1987) (quoting *Durland v. United States*, 161 U.S. 306, 313, 16 S.Ct. 508, 511, 40 L.Ed. 709 (1896)).[23] The Supreme Court has defined the elements of fraud to be "(1) a false representation (2) in reference to a material fact (3) made with knowledge of its falsity (4) and with the intent to deceive (5) with action taken in reliance upon the representation." *Pence v. United States*, 316 U.S. 332, 338, 62 S.Ct. 1080, 1083, 86 L.Ed. 1510 (1942). Fraud is not limited to affirmative misrepresentations, but may also be proved "through the defendant's non-action or non-disclosure of material facts intended to create a false and fraudu-

lent representation." *United States v. O'Malley*, 707 F.2d 1240, 1247 (11th Cir. 1983).

Rule 9(b) requires that each element of fraud listed above be pleaded with particularity, except for knowledge and intent which "may be averred generally." Fed.R.Civ.P. 9(b). A complaint must specifically allege the facts that amount to fraud. *Ross v. A.H. Robins Co.*, 607 F.2d 545, 557 (2d Cir.1979), *cert. denied*, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980); *Segal v. Gordon*, 467 F.2d 602, 607 (2d Cir.1972). It will not suffice to merely quote language taken from the mail and wire fraud statutes such as scheme to "defraud." *See Ross*, 607 F.2d at 557. If a claim is based on an alleged failure to inform the plaintiff of a material fact, the complaint should also allege the basis for the defendant's duty to disclose. *Nordlicht v. New York Telephone Co.*, 617 F.Supp. 220, 228 (S.D.N.Y.1985), *aff'd*, 799 F.2d 859 (2d Cir.1986), *cert. denied*, 479 U.S. 1055, 107 S.Ct. 929, 93 L.Ed.2d 981 (1987). Although allegations of knowledge of falsity and intent to defraud are not subject to the requirements of Rule 9(b), plaintiffs are not relieved of their burden to plead a factual basis for those allegations. Plaintiffs must still specifically plead events from which one can infer intent and knowledge. *Connecticut Nat'l Bank v. Fluor Corp.*, 808 F.2d 957, 962 (2d Cir.1987).[24]

---

**22.** Federal has also alleged other predicate acts which are not covered by 9(b) and which are sufficient to support a RICO claim. *See infra* note 25.

**23.** Although *McNally* dealt with mail fraud, case law interpreting the mail fraud statute also applies to the wire fraud statute. *United States v. Giovengo*, 637 F.2d 941, 944 (3d Cir.1980), *cert. denied*, 450 U.S. 1032, 101 S.Ct. 1743, 68 L.Ed.2d 228 (1981).

**24.** The case law has elaborated on the specificity requirements of Rule 9(b). When factual allegations are based on information and belief, "the complaint must set forth the source of the information and the reasons for the belief." *Andreo v. Friedlander, Gaines, Cohen, Rosenthal & Rosenberg*, 651 F.Supp. 877, 880 (D.Conn. 1986) [hereinafter *Andreo I*]. In addition,

"fraud allegations ought to specify the time, place, speaker, and content of the alleged misrepresentation." *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987). At the same time, however, Rule 9(b) does not require a plaintiff to set forth a complete history of every transaction. *Accord General Accident Ins. Co. of Amer. v. Fidelity and Deposit Co. of Ind.*, 598 F.Supp. 1223, 1232 (E.D. Pa.1984) ("[I]f the fraud allegedly involved a course of conduct over an extended period of time or series of transactions, it is not necessary to recite, in detail, the facts of each transaction of the fraudulent scheme."). Nonetheless, to survive a motion to dismiss and to satisfy Rule 9(b)'s purpose of providing fair notice to defendants, protecting defendants from unwarranted harm to reputation, and reducing the frequency of strike suits, *see DiVittorio*, 822 F.2d at 1247 (discussing the purpose of Rule 9(b)), a

Applying the foregoing principles to the present case, the court believes that Federal's amended complaint should not be dismissed for failure to comply with Rule 9(b). Although the facts alleged are not directed to the five elements of fraud, the arrangements described in the amended complaint support an inference of facts that would satisfy the elements of a fraud claim. At this stage of the proceedings, it would be putting form before substance if defendants' 9(b) motions were granted immediately. Rather, the court grants Federal 20 days in which to amend the amended complaint to add allegations of specificity that clearly describe each element of fraud. *Cf. Devaney v. Chester,* 813 F.2d 566, 569 (2d Cir.1987) (when a complaint is dismissed for failure to comply with Rule 9(b), leave to replead should be freely granted unless there is a legitimate reason for denial).[25]

### 2. *Section 1962(d)*

Along with a violation of section 1962(c), Federal appears to allege a conspiracy to violate RICO. Section 1962(d) provides:

It shall be unlawful for any person to conspire to violate any of the provisions ... of this section.

18 U.S.C. § 1962(d) (1982). To be liable under this section, the defendant " 'must have objectively manifested an agreement to participate, directly or indirectly, in the affairs of an enterprise through the commission of two or more predicate acts.' " *Andreo I,* 651 F.Supp. at 883 (quoting *La-*

*terza v. American Broadcasting Co.,* 581 F.Supp. 408, 413 (S.D.N.Y.1984)). *See also United States v. Ruggiero,* 726 F.2d 913, 921 (2d Cir.) (conviction for RICO conspiracy requires that the "defendant himself at least agreed to commit two or more predicate crimes"), *cert. denied,* 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984). "[T]he agreement proscribed by section 1962(d)," however, "is conspiracy to participate in a charged enterprise's affairs, not conspiracy to commit predicate acts." *United States v. Persico,* 832 F.2d 705, 713 (2d Cir.1987).

As this court has previously noted, "[a]lthough Rule 9(b) does not apply to claims of conspiracy because it is not one of the averments enumerated in the Rule, plaintiffs must nevertheless provide some factual basis for the legal conclusion that a conspiracy existed." *Andreo I,* 651 F.Supp. at 883 (citations omitted). As with a claim of fraud tested under 9(b), conclusory allegations are insufficient. *Id.*

Under this standard, the amended complaint does not state a claim against any of the defendants for conspiracy to violate RICO. With respect to each defendant wastepaper supplier and the suppliers as a group, the amended complaint alleges that "Amata conspired, established, conducted, and participated, with [such defendant suppliers], in an enterprise engaged in a pattern of racketeering activity which affected interstate commerce." It then gives the goals and purposes of the conspiracies and states that such conspiracies were carried out through "repeated acts" in violation of

---

plaintiff must specify at least one occasion of fraud. Additional instances of fraud can be elicited with the tools of discovery.

**25.** To the extent that Federal's RICO claim is brought under section 1962(c) and relies on predicate acts other than mail and wire fraud, amendment is not necessary. In particular, Federal has alleged a violation of "the Hobbs Act, Title 18, United States Code, Section 1951 *et seq.*" Presumably, Federal means 18 U.S.C. § 1952, which prohibits interstate travel or the use of interstate facilities, including the mail, to "promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity." 18 U.S.C. § 1952(a) (1982). Unlawful activity includes commercial bribery prohibited by state

law, *Perrin v. United States,* 444 U.S. 37, 50, 100 S.Ct. 311, 318, 62 L.Ed.2d 199 (1979), and in Connecticut commercial bribery is a crime, *see* Conn.Gen.Stat.Ann. §§ 53a–160 and –161 (West 1985). The court notes that section 53a–160 requires that the bribes be made with "intent to influence [the employee's] conduct in relation to his employer's or principal's affairs." *Id.* § 53a–160. As noted in the text *supra,* the specificity requirements of Rule 9(b) do not apply to allegations of intent. Nonetheless, Federal must still plead facts which give rise to a strong inference of intent. *See Connecticut Nat'l Bank,* 808 F.2d at 962. The court believes that Federal's allegations that bribes were paid by the defendant wastepaper suppliers to a purchasing agent of Federal are sufficient to establish intent on the part of the suppliers to influence the affairs of Federal.

18 U.S.C. §§ 1341, 1343, and 1951. This claim must fail because the amended complaint does not allege "any objective manifestation of an agreement," and it does not "set forth the facts upon which the conspiracy claim is based." *See Andreo I,* 651 F.Supp. at 883. The allegations of a RICO conspiracy are merely conclusory allegations.

### B. Sufficiency of Pattern of Racketeering and Enterprise Allegations

#### 1. *The Pattern Requirement*

■ Defendants contend that Federal has failed to allege a "pattern of racketeering."[26] Defendants cite several cases for the proposition that a pattern of racketeering is limited to "a series of separate and discrete ongoing criminal episodes or schemes." *See e.g., Superior Oil Co. v. Fulmer,* 785 F.2d 252, 257 (8th Cir.1986) (more than one racketeering activity is required in order to establish a pattern of racketeering activity). Such cases have relied on the now famous footnote 14 in *Sedima, S.P.R.L. v. Imrex. Co.,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1984), in which the Court quoted a Senate Report for the proposition that "pattern of racketeering activity" requires *"continuity plus relationship." Id.* at 496 n. 14, 105 S.Ct. at 3286 n. 14 (emphasis in original) (quoting S.Rep. No. 91-617, p. 158 (1969)). *See also, e.g., Superior Oil,* 785 F.2d at 257 (citing footnote 14).

Whatever may be the law in other circuits, however, it is now settled that in the Second Circuit a RICO plaintiff need not plead or prove the existence of multiple schemes of criminality in order to establish

a pattern of racketeering activity. *See United States v. Ianniello,* 808 F.2d 184, 192 (2d Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 3280, 97 L.Ed.2d 736 (1987). *See also Beck v. Manufacturers Hanover Trust Co.,* 820 F.2d 46, 51 (2d Cir.1987) (stating that *Ianniello* "expressly rejected a multiple episodes requirement"), *petition for cert. filed,* — U.S. —, 108 S.Ct. 698, 98 L.Ed.2d 650 (1987). According to *Ianniello,* a pattern of racketeering is established whenever "a person commits at least two acts that have the common purpose of furthering a continuing criminal enterprise with which that person is associated." *Ianniello,* 808 F.2d at 192. *See also Andreo II,* 660 F.Supp. at 1369–70 (applying *Ianniello* ).[27]

■ This court finds that Federal has alleged a pattern of racketeering under the standard set forth in *Ianniello.* Federal's amended complaint pleads at least two related acts of commercial bribery through the use of interstate facilities in violation of 18 U.S.C. § 1952 in furtherance of a single scheme to bribe Federal's employee in order to obtain commercial advantage and "defraud" Federal. That is sufficient to satisfy the pleading requirement for pattern of racketeering activity. *See Beck,* 820 F.2d at 51.

#### 2. *The Enterprise Requirement*

In the Second Circuit, the requirements of relatedness and continuity referred to by the Supreme Court in *Sedima* are addressed in the concept of enterprise under section 1962(c). "Enterprise" is defined by statute to include both legal entities such

---

**26.** 18 U.S.C. § 1961(5) (1982) states:
"pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity[.]

**27.** *Ianniello* involved a "continuing criminal enterprise" to skim profits from bars and restaurants owned by the defendants and to evade taxes. 808 F.2d at 189. Some district courts in this circuit have apparently tried to limit *Ianniello* by requiring that a plaintiff allege separate criminal episodes when the enterprise is a

lawful entity, rather than a "continuing criminal enterprise." *See e.g., Mastercraft Indus., Inc. v. Breining,* 664 F.Supp. 859, 860–61 (S.D.N.Y. 1987). This court believes, however, that *Beck* eliminates the multiple episode requirement in all cases. Although *Beck* also involved a criminal enterprise, *see* 802 F.2d at 48–49, the court in *Beck* clearly stated that *"Ianniello* confirms that two related predicate acts will suffice to establish a pattern under 18 U.S.C. sec. 1961(5)." *Id.* at 51. In any event, since this court has determined that Federal has alleged *criminal enterprises* made up of Amata and the wastepaper suppliers, *Ianniello* clearly applies.

as corporations as well as individuals "associated in fact." 18 U.S.C. § 1961(4) (1982). The latter consists of " 'a group of persons associated together for a common purpose of engaging in a course of conduct' and 'is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.' " *Ianniello*, 808 F.2d at 191 (quoting *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981)). Relatedness and continuity are provided for through the requirement that a RICO enterprise be "a continuing operation" and the predicate acts be "related to the common purpose." *Id.*

The facts of four recent cases decided by the court of appeals give substance to this definition of enterprise. In *Ianniello*, the court examined an open-ended scheme to skim profits and evade taxes on restaurants and bars owned by the defendants. 808 F.2d at 186–89. The court decided that there was a "common purpose" with "no obvious terminating goal or date," and that the scheme "clearly establish[ed] the enterprise requirement." *Id.* at 191–92. In *Beck*, the court applied *Ianniello* to the defendants' "allegedly improper treatment of bonds held by Mexico and the sale and disposition of the proceeds of the U.S. collateral." 820 F.2d at 49. Because of the fact that "the enterprise alleged by [the] plaintiffs had but one straightforward, short-lived goal—the sale of the U.S. collateral at a reduced price," [28] and the fact that after the sale "the alleged enterprise ceased functioning," the court concluded that the association was "not sufficiently continuing to constitute an 'enterprise' under [RICO]." *Id.* at 51. Similarly, in *Albany Insurance Co. v. Esses*, 831 F.2d 41 (2d Cir.1987), the court relied on *Ianniello* and *Beck* to find that the defendants' efforts to induce an insurance company to pay a single false insurance claim did not constitute an enterprise. Although the scheme involved several incidents of fraudulent representations by the defendants, all of the fraud related to one insurance claim arising

out of a fire at one of the defendants' warehouses. *Id.* at 43. As such, "the purpose of the enterprise ... had an 'obvious terminating goal or date'—inducing the insurer of its goods to pay a false insurance claim. There [was] nothing in [the] amended complaint that indicate[d] a threat of continuing criminal activity beyond this terminating goal." *Id.* at 44. Finally, in *Furman v. Cirrito*, 828 F.2d 898, 903 (2d Cir. 1987), the court held that a partnership could not be a RICO enterprise when the partnership was terminated by the alleged acts of racketeering.

 *Ianniello, Beck, Esses,* and *Furman* establish the following guidelines. As a starting point for finding a RICO enterprise, there must be "a continuing operation" and the predicate acts must be "related to the common purpose." *Ianniello*, 808 F.2d at 191. In addition, when an enterprise is purely criminal in nature, the court of appeals appears to have developed a transactional test for continuity. If the predicate acts are related to a *single transaction* that has an "obvious terminating goal or date," *Ianniello*, 808 F.2d at 192, then *Sedima*'s requirement of relatedness and continuity are not satisfied, and there is no RICO enterprise. *See Nassau–Suffolk Ice Cream, Inc. v. Integrated Resources, Inc.*, 662 F.Supp. 1499, 1505 (S.D. N.Y.1987) ("[A]t the very least, *Beck* mandates that an alleged scheme whose goal is 'straightforward [and] short-lived,' and which has an obvious termination date, should be dismissed."). Thus, enterprise was absent in *Beck* and *Esses* because the defendants' ultimate goal involved only one transaction. If, however, the criminal enterprise is one that is intended to continue indefinitely over the course of several transactions and whose purpose is achieved through multiple transactions involving predicate acts, then the plaintiff has established the existence of a RICO enterprise. Finally, *Furman* teaches that if the alleged enterprise dissolves or ends upon commis-

---

**28.** Part of the plaintiffs' amended complaint in *Beck* was dismissed on other grounds, so that the only remaining claims related to the sale of the U.S. collateral. *See* 820 F.2d at 49–50.

sion of the predicate acts, it cannot be a RICO enterprise.[29]

Applying these guidelines to the present case, Federal has adequately alleged RICO enterprises composed of Amata and individual suppliers as well as an enterprise composed of Amata and all the suppliers.[30] A fair reading of the amended complaint reveals that Federal has alleged that each enterprise had a common purpose to obtain commercial advantage and "defraud" Federal through the predicate acts of illegal bribery. Although not all suppliers were making sales to Federal for the entire period, the schemes lasted over a period of several years and involved multiple transactions between Federal and the various defendants. The enterprises had no "obvious terminating goal or date," *Ianniello,* 808 F.2d at 192, and the enterprises continued after commission of the predicate acts.[31] These facts are sufficient to satisfy the test for enterprise.

## V. *Liability of Individual Defendants*

Defendant Automated seeks dismissal of all counts against the individual officers of the corporate defendants on the grounds that the amended complaint does not contain allegations sufficient to render the individual officers liable for the torts of the corporate defendants. It is not necessary to consider this argument in detail, however, for it is clearly alleged in the amended complaint that the individual defendants themselves committed the wrongful acts. They are not named as defendants merely by virtue of their positions as officers in the defendant corporations.

## VI. *Conclusion*

Count I of the amended complaint, alleging a violation of section 1 of the Sherman Act, must be dismissed for failure to allege an impact on competition in a relevant market. Count III of the amended complaint, alleging a violation of section 2(c) of the Robinson–Patman Act, must be dismissed for lack of standing. To the extent that Count IV alleges a violation of section 1962(d) of RICO, it must be dismissed for failure to adequately allege conspiracy. To the extent that Count IV alleges a violation of section 1962(c) of RICO based on the predicate acts of mail and wire fraud, it is

**29.** Although *Furman* involved a legitimate partnershp regulated by New York law, *see* 828 F.2d at 900, this court sees no reason why its logic would not apply to criminal enterprises as well.

**30.** The fact that the defendants who are alleged to have engaged in a pattern of racketeering activity are also the members of the alleged enterprises is not fatal to a RICO complaint. Although an enterprise is "an entity separate and apart from the pattern of activity in which it engages," *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981), there is "no reason why a single entity could not be both the RICO 'person' and one of a number of members of the RICO 'enterprise.'" *Cullen v. Margiotta,* 811 F.2d 698, 729–30 (2d Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987).

**31.** Although Federal's amended complaint is not specific in its allegations of the several criminal enterprises, and indeed the RICO count merely states that Amata "conspired, established, conducted, and participated" with the various defendants "in an enterprise engaged in a pattern of racketeering activity," the necessary elements of a RICO enterprise can be inferred from the amended complaint as a whole. In particular, the amended complaint describes the conduct and the goals of the members of the enterprises. To "plead the RICO enterprise in terms of the conduct and goals of those allegedly a part of the enterprise is not a bar to the RICO cause of action." *In re Gas Reclamation, Inc. Sec. Litig.,* 659 F.Supp. 493, 516 (S.D.N.Y.1987). The allegations in the amended complaint are sufficient to put the defendants on notice of the claims against them and are satisfactory under the Federal Rules of Civil Procedures. *See Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 790 (3d Cir.1984) (notice pleading sufficient for the enterprise element of a RICO claim), *cert. denied,* 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985). This court disagrees with the conclusion reached in *Plount v. American Home Assurance Co.,* 668 F.Supp. 204, 206–07 (S.D.N.Y.1987), that *Ianniello* and its progeny presuppose and therefore require a specifically pleaded complaint. Rule 9(b) limits specificity in pleading to averments of fraud. With respect to allegations of enterprise, Federal need only provide some factual basis for the legal conclusion that an enterprise existed. *Cf. Andreo I,* 651 F.Supp. at 883 (addressing the pleading requirements for allegations of conspiracy). To require more would conflict with RICO's remedial purpose, *see Sedima,* 473 U.S. at 498, 105 S.Ct. at 3286, and the Supreme Court's directive that "RICO is to be read broadly," *id.* at 497, 105 S.Ct. at 3286.

not dismissed, provided, however, that Federal amend the amended complaint within 20 days of this ruling to add allegations of specificity that describe each element of fraud. To the extent that Federal's section 1962(c) claim is based on predicate acts of commercial bribery, it is not dismissed and no amendment is necessary.

SO ORDERED.